SKOKIE FEDERAL SAVINGS AND LOAN ASSOCIATION *et al.*, Plaintiffs-Appellants, *v.* THE ILLINOIS SAVINGS AND LOAN BOARD *et al.*, Defendants-Appellees.

First District (4th Division)   Nos. 76-953 through 76-956, and 76-1168 cons.

Opinion filed June 15, 1978.

Russell, Bridewell, Sembower & Cook, of Chicago (David A. Bridewell and John A. Cook, of counsel), for appellants.

William J. Scott, Attorney General, of Chicago (Mary F. Stafford, Assistant Attorney General, of counsel) for appellee Illinois Savings and Loan Board.

Robert L. Byman, of Jenner & Block, of Chicago, for appellee Ben Franklin Savings and Loan Association.

Morrissey, Kabat, Lillig & Kemp, of Oak Brook (David L. Kabat and Walter W. Morrissey, of counsel), for appellees Bridgeport Building and Loan Association and Unity Savings Association.

Lissner, Rothenberg, Reif and Barth, of Chicago (Henry B. Rothenberg and Martin R. Rothenberg, of counsel), for appellee Niles Savings and Loan Association.

Martin, Craig, Chester & Sonnenschein, of Chicago, for appellee Cardinal Savings and Loan Association.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

In these five consolidated appeals, pursuant to the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*), plaintiffs, various federally chartered savings and loan associations, have challenged decisions of the Illinois Savings and Loan Board and the Commissioner of Savings and Loan Associations (Commissioner), which permit State-chartered savings and loan associations to compete in plaintiffs' respective market areas. In each case the circuit court affirmed the administrative decisions allowing such action. There are several issues of constitutional import and statutory construction common to these appeals which will be enumerated. These issues will be discussed in common, and those issues particular to each case will be set forth in the discussion pertaining to each individual case.

We are advised that a substantial portion of this litigation is tangentially related to a decision permitting federally-chartered savings and loan associations to obtain federal approval to operate branches without regard to any state restrictions on such activity. (*Lyons Savings & Loan Association v. Federal Home Loan Bank Board* (N.D. Ill. 1974), 377 F. Supp. 11, 26.) Shortly thereafter, various State-chartered savings and loan associations commenced proceedings which, in effect, sought expansion of their interests. See generally 51 Chi.-Kent L. Rev. 656 (1974).

In cause No. 76-953, Albany Savings and Loan Association (Albany), located in Chicago, agreed to sell its limited assets to Ben Franklin Savings and Loan (Ben Franklin), a State-chartered institution located in Oak Brook, Illinois, which would result in the closing of Albany's Chicago office. On August 26, 1975, the Commissioner approved the transaction based on a number of related applications. Specifically, he found the sale was properly accepted by the parties, that the sale was fair, and that Albany had proposed an acceptable plan of liquidation. Of particular importance to this case were two other actions taken by the Commissioner. First, he approved Albany's request to change its business office from the southwest side of Chicago to the Old Orchard Shopping Center in Skokie, Illinois, conditioned on accomplishing the change within 12 months. He also approved Ben Franklin's application to maintain a facility at the Old Orchard Shopping Center conditioned on

completion of the sale of Albany. The record also shows that during this time Ben Franklin apparently changed its location to the Lakehurst Shopping Center in Waukegan.

As summarized by plaintiff, Skokie Federal Savings and Loan Association (Skokie Federal), this series of transactions enabled Ben Franklin to operate its main office in Waukegan while maintaining facilities at Oak Brook from where it had relocated and at the Old Orchard Shopping Center because of its bulk-sale acquisition of Albany which also had been granted a relocation. In its brief, Ben Franklin admits to operating two facilities. It agrees that at the time in question one facility was proper, but it maintains that an additional facility might be gained by means of a bulk sale, as here.

Plaintiff administratively challenged this action, but, after extensive hearing, the Illinois Savings and Loan Board affirmed the Commissioner's actions. On administrative review, the circuit court confirmed that decision, and plaintiff has appealed.

In cause No. 76-954, Bridgeport Building and Loan Association (Bridgeport), a State-chartered institution, was located in Bridgeport, Illinois, some 250 miles distant from the Old Orchard Shopping Center. In February 1975 it filed an application with the Commissioner seeking to relocate to the latter location. Bridgeport later sought to retain a facility at its original situs should its application to relocate be approved. The record also establishes Bridgeport's intent to consummate a bulk sale of its assets to Unity Savings and Loan Association (Unity). About this same time, Unity, a State-chartered institution with its principal business office located in Schaumburg, Illinois, and 17 facility offices located throughout the state, sought to maintain a facility both in Bridgeport, Illinois, and the Old Orchard Shopping Center. Unity also indicated that it intended to purchase all the assets of Bridgeport.

Plaintiff, Skokie Federal, opposed Bridgeport's action. After hearings, the plan for Bridgeport's relocation and maintenance of a facility at its former location conditioned, *inter alia*, upon its sale of assets to an insured institution was approved in November 1975. Skokie Federal then unsuccessfully sought administrative review in the circuit court.

In cause No. 76-955, Niles Savings and Loan Association (Niles Savings) applied to the Commissioner to relocate its principal office 1.7 miles from its present office and to retain a facility at the latter location. In December 1974, less than two months later, the Commissioner approved the application. Plaintiffs Skokie Federal and Second Federal Savings and Loan Association of Chicago (Second Federal), which operate in the area, unsuccessfully contested the relocation in subsequent administrative proceedings before the Savings and Loan Board and the circuit court.

In cause No. 76-956, Cardinal Savings and Loan Association (Cardinal) sought to change its business office from Dundee to Crystal Lake, Illinois, a distance of 10 miles. Plaintiff, First Federal Savings and Loan Association of Crystal Lake (First Federal), objected to the relocation. The Commissioner approved the relocation as well as the maintenance of a facility in Dundee. The circuit court confirmed the administrative proceedings upholding the Commissioner's action.

Finally, in cause No. 76-1168, Unity Savings of Park Forest (Unity Savings) sought to relocate at or near the Yorktown Shopping Center in Lombard and retain a facility at its current location in Park Forest. In October 1975, the Commissioner approved the relocation and retention of the facility on condition that the relocation occur within one year and the site be no closer than one-quarter mile from an existing savings and loan association or in excess of the same distance from the Yorktown Shopping Center. Plaintiff, Prospect Federal Savings and Loan Association (Prospect Federal), on administrative review did not prevail in its attempt to prevent Unity Savings from securing its request.[1]

These consolidated appeals present issues, *inter alia*, which are either common to all or issues which are common to several. Of statutory significance in several regards is section 1—9 of the Illinois Savings and Loan Act governing State-chartered institutions. (Ill. Rev. Stat. 1975, ch. 32, par. 709.) Prior to 1971, that section prohibited any savings association from establishing any branches or offices unless similar opportunities were afforded banks. (Ill. Rev. Stat. 1969, ch. 32, par. 709(b).) In 1971, the statute was amended to provide an exception to the aforesaid limitation to the extent "the Commission may adopt regulations which provide for the establishment of a facility, as defined by the Commissioner, in the case of a supervisory merger * * *, or, a single facility in the case of a relocation." (Ill. Rev. Stat. 1973, ch. 32, par. 709(b).) This exception subsequently was modified by Public Act 78-943 (effective November 14, 1973) to permit the operation of a facility not only occasioned by a supervisory merger but also by consolidation or bulk sale. Public Act 79-968 further amended this section (the added language is italicized here, while the deleted language appears in brackets):

"(b) No association *may* [shall] establish branches or offices at

[1] Public Act 79-968, effective October 1, 1975, deleted the requirement of approval by the Savings and Loan Board for the Commissioner's determinations in certain actions such as those in the present cases. Administrative decisions by the Commissioner in cause Nos. 76-954 and 76-1168 were not made until after that effective date thereby obviating the necessity of further administrative action by the Savings and Loan Board. (See Ill. Rev. Stat. 1975, ch. 32, par. 864.) In cause No. 76-956, the Board rendered a decision after the effective date of Public Act 79-968 upon direction of the circuit court for reasons that are not clearly evident from the record before us.

which savings or investments are regularly received or loans approved, unless and to the geographical extent branch powers and offices are granted to state banks under the 'Illinois Banking Act', as amended, or as it may be amended or supplemented, except the Commissioner may adopt regulations which provide for the establishment of *facilities* [a facility], as defined by the Commissioner, in the case of *mergers, consolidations* [a supervisory merger, consolidation] or bulk *sales* [sale]; or, *facilities* [a single facility] in the case of *relocations* [a relocation]." (1975 Ill. Laws, at 2922 (effective October 1, 1975).)

The 1975 amendments would appear to have substantially lessened the restrictions on the expansion of state-chartered associations.

■■ Plaintiffs maintain that section 1—9(b) of the Savings and Loan Act is an unconstitutional delegation of legislative authority to the Commissioner because generally there are no limitations or guidelines contained therein upon which to base the requisite regulations or upon which the exercise of the Commissioner's statutory authority may be circumscribed. This argument was rejected in the recent appellate court decision of *Security Savings & Loan Association v. Griffin* (1978), 56 Ill. App. 3d 903, 372 N.E.2d 1118. There, the Fourth District Appellate Court specifically noted that section 1—9(c) contained restrictions for the nature of the business to be conducted. That section provides:

"No business shall be done at a facility except receiving deposits, cashing and issuing checks, drafts and money orders, changing money, processing mortgages and receiving payments on existing indebtedness." Ill. Rev. Stat. 1975, ch. 32, par. 709(c).

■■■ Moreover, in *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 369 N.E.2d 875, our supreme court discussed the concept of the constitutional separation of power between the three branches of government in the context of a statutory authorization to the Director of Insurance to prescribe insurance policy provisions, in effect, through administrative rule-making. The court examined the present complexity of government, noting that to require the legislature to delineate all permissible actions promulgated pursuant to administrative regulations would result in hopeless inefficiency. Yet the court recognized that administrative rule-making was not to be unrestrained.

"Accordingly, we find that the view which has developed through the decisions of this court in recent years requires that the legislature, in delegating its authority provide sufficient identification of the following:

(1) The *persons* and *activities* potentially subject to regulation;

(2) the *harm* sought to be prevented; and

(3) the general *means* intended to be available to the administrator to prevent the identified harm." (68 Ill. 2d 361, 372.)

Section 1—9(b) of the Illinois Savings and Loan Act complies with these criteria.

From a reading of section 1—9(b), it is obvious the parties and scope of activities to be regulated are statutorily limited by section 1—9(c). Thus the initial consideration in *Stofer* is fulfilled.

The second factor relates to the harm to be prevented. We believe an examination of the converse of this proposition is sufficient to answer this question. It is apparent the legislature in effect permitted expansion of services by state-chartered savings and loan associations by enactment of the recent amendments to section 1—9(b), thereby furthering the salutary purposes set forth in section 1—2 to expand the possibilities of home ownership and prompt savings. (Ill. Rev. Stat. 1975, ch. 32, par. 702(a).) The increase in competition between mortgage-lending institutions within an area might allow for potentially lower mortgage rates or the costs involved in those transactions, thereby increasing the possibility that persons who might otherwise be unable to purchase a home at that time would be afforded the means to do so. Moreover, the Commissioner is to determine the correctness of such action based, in part, on community need. (Ill. Rev. Stat. 1975, ch. 32, par. 744(h)(1).) These factors significantly frame the Commissioner's authority and provide a substantial benefit to residents of an area.

Finally, the question remains whether the administrative agency possesses the available means to implement the statutorily delegated authority. It is apparent from the present cases that the Commissioner has the means to implement legislative policy. There is no merit to plaintiffs' contention regarding the unconstitutional delegation of authority.

■■ Several plaintiffs maintain that section 1—9(b) is violative of the State constitutional provision which prohibits branch banking unless approved by three-fifths vote of the General Assembly. (Ill. Const. 1970, art. XIII, §8.) This contention was also rejected by the court in *Security Savings & Loan Association v. Griffin* (1978), 56 Ill. App. 3d 903, 372 N.E.2d 1118, where it referred to the fact that in section 5(15)(c) of the Illinois Banking Act (Ill. Rev. Stat. 1975, ch. 16½, par. 105(15)(c)), the legislature has empowered banks to maintain a facility for drive-in customers. The authorized functions performed at those locations are, with limited exceptions, the same as those functions permitted under section 1—9(c) of the Savings and Loan Act. We conclude that section 1—9(b) both prior to and after the 1975 amendment by Public Act 79-968 was not violative of any branch-banking prohibiton.

It is argued that article X of the rules and regulations adopted by the

Commissioner pertaining to establishing a facility under section 1—9(b) of the Savings and Loan Act is improper.[2]

Plaintiffs in cause Nos. 76-955 and 76-956 claim that this administrative regulation is improper because it does not take into consideration the purpose of section 1—9(b), which plaintiffs say is to allow maintenance of a facility in an area of economic stagnation. Plaintiffs also assert that the considerations in article X are vague and do not delineate a standard to be applied.

■■ Plaintiffs rely on the governor's approval message to the 1971

[2]Article X of the Commissioner's Rules and Regulations at the time of these administrative proceedings prior to the 1975 amendment to section 1—9(b) provided:

"Section 1. *Authorization.*) Subject to the laws of the State of Illinois and this Article X, an association may maintain a facility:

(a) At the existing location of a merging association's business office, incident to a supervisory merger between the continuing association and the merging association; and

(b) At the existing location of an association's business office, incident to a change in the location of the association's business office, except, however, no association may maintain more than one facility as the result of a relocation; and

(c) No business shall be conducted at any facility except the following:

(i) Receiving deposits; and

(ii) Cashing and issuing checks, drafts and money orders; and

(iii) Changing money; and

(iv) Receiving payments on existing indebtedness.

Section 2. ° ° °

(b) an application for approval of the maintenance of a facility shall be filed with the Commissioner simultaneous with the filing of: (1) the application for approval by the Commissioner of a proposed merger, in the case of a facility authorized by Section 1(a) of this Article X, or (2) the application for approval by the Commissioner of a by-law amendment providing for a change in the location of an association's business office, in the case of a facility authorized by Section 1(b) of this Article X.

Section 3. *Required Findings.*) The Commissioner shall not approve the maintenance of a facility unless he shall find:

(a) In the case of a facility authorized by Section 1(a) of this Article X:

(i) That a need exists for savings and loan association services in the community or area of operation of the proposed facility and the proposed facility will satisfy said need; or that it is in the best interest of the association that the proposed facility be maintained; and

(ii) That the proposed facility can be maintained without undue injury to properly conducted existing associations; and

(iii) That the purposes of the Act will be furthered by maintenance of the facility.

(b) In the case of a facility authorized by Section 1(b) of this Article X:

(i) That a need exists for savings and loan association services in the community or area of operation of the association's existing business office and the proposed facility will satisfy said need; or that it is in the best interest of the association that the proposed facility be maintained; and

(ii) That the facility can be maintained without undue injury to properly conducted existing associations; and

(iii) That the purposes of the Act will be furthered by maintenance of the facility."

After the 1975 amendment, article X was amended in conformity therewith.

amendment to section 1—9(b), which characterized the statutory modification to allow a facility, as a means of retaining a financial institution in an area, otherwise not able to independently support such institution. (Ill. Ann. Stat., ch. 32, par. 709, (Smith-Hurd Supp. 1978).) Plaintiffs maintain that article X does not consider this factor. The plain language of section 1—9(b) does not set forth the limitation which plaintiffs seek to engraft upon that section. While the result which plaintiffs advance is certainly within contemplation under section 1—9(b), that result does not appear to be the only situation which allows for the application of section 1—9(b). To construe the statute, as plaintiffs suggest, would be to improperly place a judicial restriction upon the statute which is not evident from the language contained therein. *Cf. Radford v. Withrow* (1948), 401 Ill. 14, 81 N.E.2d 417.

Plaintiffs also say the criteria for establishment of a facility requiring that "a need exist" and "undue injury not occur," as set forth in article X, are vague and uncertain and do not constitute controlling standards to be applied by the Commissioner.

■■ The aforesaid criteria are also set forth in sections 2—4 and 3—4(h) of the statute pertaining to establishment or relocation of an association. (Ill. Rev. Stat. 1975, ch. 32, pars. 724 and 744(h).) These concepts have been recognized as not subject to precise definition. (See *Skokie Federal Savings & Loan Association v. Becker* (1962), 26 Ill. 2d 76, 185 N.E.2d 861.) We perceive no invalidity to those standards set forth in article X.

In all these appeals plaintiffs contest the Commissioner's orders because they did not in any manner define the type of facility which could be maintained. Plaintiffs rely on section 1—9(b) which permits "establishment of facilities as defined by the Commissioner * * *." Plaintiffs contend that the Commissioner had no information upon which to base a judgment concerning the type of facility to be permitted and functions it should perform. Section 1—9(c) of the Savings and Loan Act statutorily limits the activities which may be performed at a facility. Similarly, article X, section 1(c), as heretofore set forth, of the Commissioner's rules and regulations is in accord with section 1—9(c).

■■ These enumerated authorized activities would appear to be integral facets of the savings and loan industry. In the present cases the Commissioner was obviously intending to confer the maximum activity permissible in order to allow complete utilization of the respective facilities, thereby advancing the purposes enunciated in the Savings and Loan Act. To suggest otherwise and require proof as to the propriety of each permissible function, as plaintiffs seem to suggest, would place an undue burden upon parties seeking to establish such a facility which is not specifically required by law.

In cause Nos. 76-953 and 76-954 several common questions are raised concerning the methods utilized by Ben Franklin and Unity to

obtain facilities at or near the Old Orchard Shopping Center. First, plaintiff (Skokie Federal) maintains that the requests by Albany and Bridgeport to relocate to the shopping center were mere subterfuges and the transactions were without substance because it was never the intent of Albany and Bridgeport to relocate. Illustrative of its position, plaintiff notes that neither Albany nor Bridgeport possessed the assets to carry forward a legitimate relocation. Rather, plaintiff asserts that the requests for relocation were a guise to allow Unity and Ben Franklin to expand their operation in contravention of the Savings and Loan Act and the prohibition against branch banking, a position which we have rejected.

■■■ Section 1—9(b), however, does not prohibit the activity of which plaintiff complains. The statute does not require that the actual intent to relocate be a factor when the ultimate result contemplated is a merger, consolidation or bulk sale with another state-chartered association. Therefore, the intent of Albany or Bridgeport is not controlling.

■■ Plaintiff in cause No. 76-953 maintains that the only facility which Ben Franklin might retain was at Albany's "existing location" in Chicago and not an "authorized location" which is permitted under the 1975 amendment to section 1—9(b) and the corresponding amendment to the Commissioner's regulations pertaining thereto. This language change had not occurred at the time of the final administrative decision in this case. Basically, plaintiff's argument arises because of the coordinated applications of Ben Franklin and Albany, although plaintiff does not maintain the procedure was improper. Of interest in this regard is the decision in *Berwyn Savings & Loan Association v. Illinois Savings & Loan Board* (1975), 29 Ill. App. 3d 965, 331 N.E.2d 254, which held that an application for a relocation and maintenance of a facility at a former location must be filed simultaneously in accord with the applicable administrative regulations. The procedure utilized in this case prompted coordination of the filings of the Albany applications herein to prevent a later challenge based on the claim that the actions were not simultaneously conducted. And the Commissioner's decision based on Albany's request and the Ben Franklin petition were also simultaneously acted upon. It would appear that the procedure utilized rather than any violations of section 1—9(b) accounts for plaintiff's claim of error. Moreover, plaintiff's assertion concerning the requirement that Ben Franklin's facility must be situated solely at Albany's former office in Chicago is predicated in part on plaintiff's erroneous assumption that the 1971 amendment to section 1—9(b) was to be utilized only in cases where an association sought to remove its principal business office from an economically declining area. We cannot accept plaintiff's narrow interpretation of "existing location" under the facts presented. There was no error in the Albany-Ben Franklin matter in this regard.

It is also argued that the bulk sale of assets from Albany to Ben Franklin was not "supervisory" as required by section 1—9(b) prior to its amendment in 1975. Skokie Federal maintains this form of acquisition occurs when it serves a public purpose which might be related to the impairment of capital requiring takeover of the weaker institution by a stronger association.

■■ The limited reading by plaintiff of the significance of the term "supervisory" is not compelling. Article VII of the Illinois Savings and Loan Act (Ill. Rev. Stat. 1975, ch. 32, pars. 841-64) concerns supervision of State-chartered savings and loan associations by the Commissioner and Savings and Loan Board. Section 7—2 (par. 842) authorizes annual examination of such associations. In regard to situations where an association's status is questionable, section 7—8 (par. 848) empowers the Commissioner to take control of an association's assets and conduct its activities (par. 850) under varying circumstances therein specified. Section 7—11 (par. 851(b)) permits the insurer of an association, of which the Commissioner has taken custody under section 7—8, to submit a plan to the Commissioner for reorganization, liquidation or merger. Sections 7—17 and 7—18 (pars. 857 and 858) create the Savings and Loan Board which, in part, reviews the Commissioner's decision. Articles VIII and IX of the Savings and Loan Act (pars. 871-909) concern reorganization or voluntary liquidation of an association. The Commissioner is directly involved in both procedures (par. 875(d) and pars. 904(b), 909). An overview of the Savings and Loan Act, as heretofore illustrated, shows that the Commissioner possessed supervisory authority over various business facets of a State-chartered association not merely those set forth in section 1—9(b). It seems clear that the term "supervisory" as used in that latter section was generic rather than indicative of any legislative intent to limit the parameters of section 1—9(b) to effect only financially questionable institutions. In cause No. 76-953, the Commissioner approved the procedures sought by Albany and Ben Franklin, and there was no violation of section 1—9(b).

In cause No. 76-954, arguments similar to those advanced in cause No. 76-953 are made concerning the claim that the facility obtained by Unity could not be maintained at or near the Old Orchard Shopping Center and it is urged there was a lack of a "supervisory" bulk sale. We have resolved those contentions adversely to plaintiff. However, we deem it advisable to further comment on such matters because of plaintiff's specific complaint that Unity utilized the opportunity to obtain a facility when it already possessed several others. Specifically, plaintiff says that the necessary applications in that appeal were filed prior to the 1975 amendments to section 1—9(b) and the subsequent modification of administrative regulations in article X, thus requiring determination under prior law. To

reiterate, these changes, in part, deleted the term "supervisory" from section 1—9(b) concerning association mergers, consolidations, or bulk sales. It also permitted the establishment of more than one facility as a result thereof. The Commissioner approved the Unity-Bridgeport applications subsequent to those modifications.[3]

■■ The contention that the 1975 statutory amendment would not substantively pertain to cases which had not yet completed the administrative process by October 1, 1975, the statutory amendment's effective date, is without merit. Plaintiff in cause No. 76-954 advances no controlling authority to substantiate its claim that the law in effect at the time the administrative application was filed is determinative on appeal. A change in the law while an appeal is pending has received varying applicability. (Compare *Ashland Chemical Co. v. Pollution Control Board* (1978), 57 Ill. App. 3d 1052, 373 N.E.2d 826; *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 371 N.E.2d 634; *Rios v. Jones* (1976), 63 Ill. 2d 488, 348 N.E.2d 825; *Hogan v. Bleeker* (1963), 29 Ill. 2d 181, 193 N.E.2d 844; see generally *Tunnell v. Frye* (Del. Super. 1969), 254 A.2d 58.) But, no error occurs when the agency applies the law in effect at the time of its decision. (2 Am. Jur. 2d *Administrative Law* §757, at 657 (1962).) There is no basis to any claim that it was improper to allow any application after October 1, 1975, but filed prior thereto, which would have resulted in maintenance of multiple facilities for a State-chartered savings and loan association, or permitted maintenance of a facility at other than an existing location. And regardless of our prior consideration of the term "supervisory" in cause No. 76-953, it would be unnecessary to consider whether a bulk sale of Bridgeport's assets to Unity was supervisory since language to that effect was deleted from section 1—9(b) by the 1975 amendment.

We now direct our attention to the specific factual issues raised in each appeal. In this regard it is necessary to consider section 3—4(h) (par. 744(h)) of the Savings and Loan Act prior to and after its amendment, effective October 1, 1975, by Public Act 79-968. (The italicized portions of that Act as set forth indicate the modification while the deleted language appears in brackets.)

"(h) If a by-law amendment provides for a change in the location of an association's business office *or the establishment of*

---

[3] The question of the applicability of the 1975 statutory amendment is also raised by plaintiff under similar circumstances in cause No. 76-1168 when the Commissioner issued a certificate of an approval to Unity Savings of Park Forest for a change of location and maintenance of a facility shortly after the effective date of the 1975 amendment and several months before the circuit court's denial of relief in that case. In view of the disposition of that cause, as hereinafter discussed, it is unnecessary to consider the amendment's applicability to that appeal.

*an additional office* [to a location which is more than one mile distant from the existing location], the Commissioner shall not approve the amendment unless he finds that (1) a need exists for an association in the proposed new location; (2) the capital of the association meets the minimum initial capital requirements *for a new office as established by regulation of the Commissioner* [of this Act with respect to the new location]; (3) the proposed change of location can be effected without undue injury to other properly conducted associations * * *." (1975 Ill. Laws, at 2930.)

In each of these consolidated appeals, it is claimed that the administrative determination was contrary to the manifest weight of the evidence. Within this context it must be noted that the administrative determinations of fact represent an expert judgment of factors not readily measurable by precise judicial standards, and such findings should not be reversed unless the record lacks support for the administrative conclusions. *Skokie Federal Savings & Loan v. Becker* (1962), 26 Ill. 2d 76, 185 N.E.2d 861.

In cause No. 76-953, plaintiff asserts that the burden of proof was improperly placed upon it because the Commissioner had previously decided to grant Albany's assimilation into Ben Franklin before evidence pertaining to economic data was presented. Plaintiff also maintains that the evidence was insufficient to demonstrate the need for another savings association at the Old Orchard Shopping Center and to allow its establishment would cause undue injury. Moreover, plaintiff argues that Albany's relocation was patently illusory because Albany lacked adequate capital to justify relocation due to its plan to liquidate.

To support its claim concerning the question of who had the burden of proof, plaintiff relies, in part, on an unsigned letter contained in the record which was purportedly written in April 1973 by the State Savings and Loan Commissioner to the Federal Home Loan Bank Board. The letter outlined the State's efforts to reduce the number of uninsured State-chartered savings associations and expressed the inclination to approve the merger of Albany, which was uninsured, with Ben Franklin, which was insured, and to permit the location of an office in the Old Orchard Shopping Center as a result thereof. However, the letter indicated this decision was not final. This correspondence also expressed the negative opinion as to the potential for success in the shopping center because Talman Federal Savings and Loan Association was contemplating a major office in the same area. Sixteen months later, the applications herein questioned were approved by the acting Commissioner, and plaintiff then requested further consideration of the matter by the Savings and Loan Board. Extensive hearings were conducted at that time and substantial

documentary evidence introduced before the final administrative decision was rendered confirming the decision of the acting Commissioner.

■■ It is urged by Ben Franklin that the issue concerning the 1973 letter has been waived because it is advanced for the first time on appeal. (*Woman's Athletic Club v. Hulman* (1964), 31 Ill. 2d 449, 202 N.E.2d 528.) Additionally, we do not believe this matter might be considered as significant when viewed in the context of the record. The letter was equivocal in stating the decision to approve the Albany-Ben Franklin joinder was not final. And, there is no indication in this record that the final administrative decision was unfairly made or was not based upon proper considerations. See *Hortonville Joint School District No. 1 v. Hortonville Education Association* (1976), 426 U.S. 482, 49 L. Ed. 2d 1, 96 S. Ct. 2308.

The record shows that conflicting testimony of knowledgeable individuals was presented. Plaintiff presented the testimony of two management consultants who agreed there was no need for another association in the area because of the number already present and, in particular, because of Talman Federal's plan to locate near the Old Orchard Shopping Center. Testimony of plaintiff's president and that of another officer of a savings association in the area was presented. Both claimed undue injury might occur.

■■ Suffice it to note that their testimony differed from the expert testimony proffered by Albany-Ben Franklin's expert witness, who advanced the varying criteria to be considered, and reached opposite determinations concerning need and undue injury based on his analysis of the matter. This witness was of the opinion that a number of shoppers at Old Orchard would utilize an association for the sake of convenience even though other associations were nearby. He further concluded that savings potential in the area was sufficient to sustain another association. From the record before us it cannot be said the final administrative decision in cause No. 76-953 lacks support in the record or that an existing financial institution will be substantially prejudiced thereby. (*Arlington Heights Federal Savings & Loan Association v. Knight* (1963), 29 Ill. 2d 558, 194 N.E.2d 338.) Moreover, based on Albany's assimilation into Ben Franklin, upon which this entire transaction appears to have been predicated, it is clear that ample capital would exist under section 3—4(h)(2) of the Savings and Loan Act. Plaintiff does not argue reliance on this consideration would be inappropriate to determine the question of proper capitalization.

In cause No. 76-954, plaintiff adopts the evidentiary arguments advanced in No. 76-953 concerning the lack of substance to Bridgeport's relocation application and seems to suggest Bridgeport's capital

requirements could not be met. Moreover, plaintiff argues that it will suffer undue injury.

Plaintiff's initial contention concerning the illusory nature of Bridgeport's attempt to relocate is based primarily on its position that a violation of branch-banking prohibitions has occurred because Unity was thereby able to obtain another location. We have previously held that section 1—9(b) is not violative of such proscription, nor would that section, as amended, prohibit multiple facilities. Plaintiff also suggests that, since no office of Bridgeport existed at the Old Orchard Shopping Center, the intent of section 1—9(b), which plaintiff says was to authorize a facility to maintain current service to a community, has been defeated. This view has been rejected as it pertained to cause No. 76-953, and further comment is unnecessary.

In pertinent part to the remaining factual issues, the record shows that at the time of the administrative hearing in August 1975, Bridgeport was still examining several sites that were within one-quarter mile of the Old Orchard Shopping Center, but it had not yet committed itself to a specific location. The hearing also disclosed Bridgeport was capitalized in the amount of $662,000. The record shows factual disputes concerning the questions of need and undue injury. Various witnesses of area savings institutions said that the locale had been saturated by such institutions. They concluded that no need existed for another institution and undue injury would occur.[4] The record also shows that plaintiff had received Federal permission to open an office very near the Old Orchard Shopping Center. The Commissioner's final order required that the relocation be no further distant than a quarter mile from the perimeter of the shopping center.

■■ Plaintiff seems to question the sufficiency of the evidence to support the Commissioner's conclusion that Bridgeport lacked the requisite capitalization (section 3—4(h)(2)). The hearing officer specifically found that proper capitalization existed, and we find no basis in the record to indicate the administrative conclusion was improper. Additionally, in view of Skokie Federal's recent expansion into the same area, it would appear unavailing for it to question the need for another savings association. The record presented is conflicting about the ramifications, if any, of another savings institution in the near vicinity of the Old Orchard Shopping Center. The criteria relied upon by the various witnesses, who expressed views on the matter, was not uniform. The record here requires the acceptance of the administrative decision.

[4] Noteworthy is the testimony of James Worth, an officer of the Old Orchard State Bank who excoriated Federal officials for their lax approach to granting permission to expand the location of Federal savings and loan associations to the apparent detriment of Federal banks and State-regulated institutions.

Plaintiffs in cause No. 76-955, which concerns the relocation of Niles Savings, suggest that no need exists for another association in the area. They say a discrepancy was contained in pertinent statistical data which was presented to justify Niles' relocation and that Niles made no attempt to explain this deviation by calling its economic expert as a witness thereby creating an unfavorable presumption. Plaintiffs also maintain the record shows they will suffer undue injury and support for all the area's savings institutions will be eroded.

The record here discloses that the office of Niles Savings was located at 7077 West Dempster in Niles. It sought to relocate this office to 5800 West Dempster in Morton Grove, a distance of 1.7 miles, and maintain a facility at the former location. The proposed relocation was about .4 miles from Second Federal and 1.2 miles from Skokie Federal, plaintiffs herein. The Savings and Loan Board adopted the factual findings of its hearing officer who, in an extensive memorandum summarizing the evidence presented, concluded that a need existed in the area of Niles Savings' proposed location and that undue injury would not occur to other properly conducted associations.

Generally, plaintiffs' expert, Philip Butzen, testified that in the market area of Niles Savings' proposed relocation or near its periphery, based on a 2-mile radius, there existed four operational institutions (including Niles Savings and its proposed relocation site) and four which had recently received operational approval. Two applications were pending. Within a 4-mile radius additional institutions were situated. Butzen concluded that the level of support for Niles Savings would not exist to justify a need for the relocation, and he stated plaintiffs could be unduly injured. He also criticized the report of Niles Savings' expert, Dr. Robert Seymour, which concluded that the area savings potential would support the relocation. Primarily, Butzen said that this report was based on census tract information which covered an area larger than the proposed market area.

An attempt was made to show that Butzen had determined that a larger service area existed for a nearby Federal savings association which had recently commenced operation. Butzen explained that various other factors influenced his determination in that matter.

Other witnesses testified for plaintiffs and claimed the area had been saturated by savings institutions. Specifically, the president of Skokie Federal said some injury would occur to his association as a result of the relocation and undue injury would occur to Second Federal which had been established at that location when it took over a financially troubled association. Second Federal had merely handled the mortgages of the former association and had not received approval to commence full service operations until recently. However, as the record suggests, Second Federal had not pursued an aggressive policy of expanding its business opportunity since full operations began, and the officer in charge of

mortgages came from the main office to its office in Morton Grove only one day a week to review mortgage applications.

Plaintiffs questioned the reason for Niles Savings' failure to call Dr. Seymour. The hearing officer instructed plaintiffs they might, although plaintiffs did not do so.

■■ We do not believe that any unfavorable inference may be ascribed to Niles Savings because it did not call Dr. Seymour to testify. While an unfavorable inference arguably might be drawn from his failure to testify (*Santucci Construction Co. v. County of Cook* (1974), 21 Ill. App. 3d 527, 315 N.E.2d 565), Dr. Seymour was not called by Skokie Federal, who had utilized his expertise on its behalf in cause No. 76-953. Under such circumstances, we do not believe that any adverse inference may arise. (See *Wetherell v. Matson* (1977), 52 Ill. App. 3d 314, 367 N.E.2d 472; *Wood v. Mobil Chemical Co.* (1977), 50 Ill. App. 3d 465, 365 N.E.2d 1087.) We further note the hearing officer's report, upon which the final administrative decision was based, indicated that his recommendations were made on evidence other than Dr. Seymour's report.

■■ The evidence showed that Second Federal and the office sought for relocation of Niles Savings would service a residential area of significant size. The other institutions were in a peripheral area and would not suffer undue injury. Because of Second Federal's current business activity, it would not appear to be substantially prejudiced by the relocation. After examination of the record, we conclude that the Savings and Loan Board's determination that a need existed and undue injury would not occur was permissible based on the evidence presented at the administrative proceedings.

In cause No. 76-956, plaintiff similarly maintains that it will be unduly injured and there is no need for another association in an area where several other savings institutions are attempting to gain entry into the market area in addition to Cardinal. Plaintiff also asserts that Cardinal has not settled on the precise area for its location in the vicinity of Crystal Lake thereby invalidating its attempt to relocate. And plaintiff claims that Cardinal has not properly modified its bylaws to reflect this change.

A review of the record shows that Crystal Lake is a community located approximately 48 miles from Chicago. Its population had been rapidly expanding during the decade preceding this case and was about 16,000 people at the time this matter arose. Crystal Lake was serviced by two federally chartered banks and plaintiff, First Federal Savings and Loan of Crystal Lake. The record establishes that in the 5 years prior to this case the aforesaid institutions had noticeably increased their assets. There were also other financial institutions within a 10-mile radius.

Cardinal had its principal place of business in Dundee, Illinois, about 10 miles away. It sought to relocate in the Crystal Lake region, although its precise site is now disputed. The record indicates this site was near the

intersection of Routes 176 and 14; and plaintiff's counsel represented during proceedings in the circuit court that the site had been rezoned to permit such use.

After the Commissioner had approved Cardinal's relocation in 1974, further administrative hearings were conducted before a hearing officer for the Savings and Loan Board. Various reports and economic surveys were introduced and several witnesses testified in support or opposition to Cardinal's request. The evidence showed the Crystal Lake area was expanding both residentially and industrially. There was some dispute as to the future rate of growth due to economic considerations and disputed population projections.

Dr. Robert Seymour testified on behalf of First Federal, and he observed the housing demand had declined due, in part, to the 1974 recession in that market. Dr. Seymour noted the various institutions in the area and concluded that a need did not exist for another association. He stated that Home Federal Savings of Elgin had an application to establish an office in Crystal Lake which was pending before the Federal Home Loan Bank Board.[5] He conceded he had not determined that undue injury would occur, although Cardinal's request to relocate would threaten the growth of existing associations. It was also noted that First Federal's reserve requirements might be affected.

Robert Covey, the president of First Federal, stated that a need did not exist for another association. He was of the opinion that Cardinal's entry into Crystal Lake would divide an existing market and harm First Federal's growth rate.

Patrick Gilligan, who compiled socio-economic and demographic information in his capacity as a consultant for savings and loan institutions, testified on behalf of Cardinal. He pointed out the expanding savings market available in the area, which had been especially favorable to First Federal.

The report of the hearing officer, which was ultimately adopted by the Savings and Loan Board, detailed the evidence presented. While recognizing the unusual economic circumstances presented, it found ample support for the conclusion that no undue injury would result from Cardinal's request. In addressing the question of need, the report focused on the expanding economy of Crystal Lake and the surrounding area, although conceding the amount of savings potential was confusing. However, if the amount of savings contemplated in the record was

[5] Shortly after the matter was taken under advisement by the hearing officer, permission was granted by that Federal agency allowing Home Federal to commence operation in Crystal Lake. The parties advised the hearing officer of the matter, and, by agreement, documentation to this effect was included in the record before the recommendation of the hearing officer was made to the Savings and Loan Board. The Federal administrative decision specifically found that a need existed for another association in Crystal Lake. An additional report by Dr. Seymour reflecting this action and its ramifications was made part of the record.

attained, First Federal would benefit based on limited competition, thereby securing almost the entire amount. Even if the savings potential in the area were underestimated, the report concluded a need would exist for another association. The report urged the Commissioner's decision be upheld and concluded that a need existed for another association in order to afford competition in the primary service area. It also stated that the question of relocation was a business managerial decision.

We have reviewed the record and find nothing to suggest that the questions of need or undue injury were improperly determined in the administrative proceedings. The record presented factual questions from which varying interpretations could have been drawn. The expertise for such a decision is within the administrative agency, and plaintiff has advanced no compelling justification to justify an opposite result.

Plaintiff, however, asserts that there is no definite "proposed location" in compliance with section 3—4(h) of the Savings and Loan Act. Plaintiff notes that Cardinal's initial relocation application listed a proposed site which was thereafter twice changed without evidence of a bylaw amendment by Cardinal. The record shows that Cardinal's application to relocate specified a site which differed from the location which the Commissioner approved at the intersection of Routes 176 and 14, and from which plaintiff specifically sought further consideration by the Savings and Loan Board. The record does not disclose any objection to the change of location until after the Board had rendered its decision. Plaintiff then noted the variation in location sites in a letter to the Board after its decision had been rendered; the letter indicated the objection was raised solely to show Cardinal did not have a definite place to relocate.

In its brief plaintiff avers that the site eventually designated by the Commissioner is several miles from the initial site selected by Cardinal and about one mile closer to plaintiff's location which Cardinal purportedly suggested prior to the Commissioner's decision. Plaintiff says that the failure to specify an exact site renders any determination of need highly suspect. Plaintiff also maintains that the record fails to show Cardinal adopted new bylaw amendments showing the change in sites as it claims is required by section 3—4(h).

■■ The latter contention, however, did not appear to be advanced in the administrative proceedings or specifically in the complaint for administrative review. During the hearing in the circuit court, plaintiff's counsel merely suggested the possible modification in site locations deprived plaintiff of due process. We therefore consider any contention regarding whether a bylaw was adopted by Cardinal for a change of location after the filing of its initial relocation application to be waived.

We also reject plaintiff's argument concerning whether such change affected the administrative decision on the question of need. It is clear the Commissioner's decision, which was confirmed by the Savings Board,

was based on the site for which the certificate of approval was granted. Plaintiff therefore was not deprived of any information upon which it could base its later administrative challenge. Moreover, while population was increasing, the area in question is not densely populated and a distance variation between sites such as suggested by plaintiff would not seem significant.

To briefly summarize, these appeals depict intense competition between Federal and State-chartered institutions in areas of residential character with an affluent population. Reasonable competition in these government regulated businesses is to be encouraged in order to better serve the public interest of the locale. It is not for this court to circumscribe administrative decisions in this regard when the record allows support for such decisions.

While cause No. 76-1168 was pending on appeal, Unity Savings of Park Forest filed a motion to dismiss the appeal which was taken with the case. Unity Savings represented that it no longer desired to relocate in the vicinity of the Yorktown Shopping Center. It notified the Commission of its decision, and the Commissioner withdrew his approval for Unity Savings' action which formed the basis of litigation in this matter.

Prospect Federal has generally objected to dismissal of this appeal because it says that Unity Savings and Loan Association (the association in cause No. 76-954) thereafter sought and received approval to relocate its principal office to the Yorktown Shopping Center. Prospect Federal asserts that these are companion associations and, relying on matters *dehors* the record, Prospect Federal maintains that its complaint for administrative review in the latter proceeding is now pending in the circuit court. Prospect Federal concludes that it is being harassed by the procedure. It therefore requests attorneys' fees, although it cites no authority to support its claim for this recovery.

In its present posture this appeal presents no issue which would affect the rights of the specific parties involved herein and the matter is moot. We therefore decline to consider the merits of cause No. 76-1168. The judgment of the circuit court is vacated and the cause remanded with directions to dismiss the complaint for administrative review. (*Wheeler v. Aetna Casualty & Surety Co.* (1974), 57 Ill. 2d 184, 311 N.E.2d 134.) Further, we do not believe that it is proper to assess attorneys' fees against Unity Savings of Park Forest as requested by Prospect Federal. *City of Chicago v. Fair Employment Practices Com.* (1976), 65 Ill. 2d 108, 357 N.E.2d 1154.

The judgments of the circuit court in cause Nos. 76-953, 76-954, 76-955 and 76-956 are affirmed. The judgment in cause No. 76-1168 is vacated and the matter remanded with directions to dismiss the complaint.

Affirmed in part, vacated in part and remanded with directions.

LINN and DIERINGER, JJ., concur.