SANTUCCI CONSTRUCTION Co., Plaintiff-Appellee, *v.* COUNTY OF COOK, Defendant-Appellant.

(No. 58921;

First District (5th Division)—July 12, 1974.

Bernard Carey, State's Attorney, of Chicago (Sheldon Gardner and Paul P. Biebel, Jr., Assistant State's Attorneys, of counsel), for appellant.

James G. O'Donohue, of Chicago (Paul P. Pennick and Philip J. Rock, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal by defendant from a decree rescinding a contract bid submitted by plaintiff and ordering the return of the $75,000 bid deposit, together with interest. The issues presented for review are whether (1) the bid was the result of a mistake which justified rescission; (2) a presumption was raised against plaintiff because certain witnesses were not produced who allegedly were essential to its claim of mistake; (3) defendant was aware that a mistake was made; and (4) the court's award of interest was proper.

In November, 1966, defendant advertised for bids concerning the construction of the main drain of the Dan Ryan Expressway, and on December 14, 1966, plaintiff and three other construction companies submitted bid proposals. With its bid, plaintiff tendered a $75,000 deposit which was subject to forfeiture and retention by defendant in the event plaintiff was low bidder and failed to execute the contract.

Plaintiff's bid was $1,095,842, and the bids by the other three contractors were in the amounts of $1,693,353.85; $1,719,770; and $1,827,904.90. Each bid was required to specify a price for 7,132 lineal feet of drainpipe. In this regard, plaintiff's bid price, including labor, was $108.50 per lineal foot, with the other three contractors specifying $169.00, $180.00 and $200.00 respectively. The total price submitted by plaintiff for this item was $773,822 (its original estimate was $1,290,892); whereas, the prices specified by the other three contractors were $1,205,308; $1,283,760 and $1,426,400.

At the trial, Glenn Frederichs, Assistant Superintendent of Highways for defendant, testified that its cost estimate for the drainpipe, including labor, was $197.45 per lineal foot, with a total estimated cost of $1,408,213.40. He also testified that the county's estimate for the cost of the entire project was $1,937,856.40. When plaintiff refused to enter

into a contract for the project, bids were again requested and submitted, with the low bid of $1,596,554 obtaining the contract.

Richard Cramer, head of the Estimating Division of defendant, testified that the county's estimated cost for the pipe was $125.00 per lineal foot to which was added labor and material charges to obtain its estimated price of $197.45 per lineal foot. He testified it was his impression that plaintiff's bid of $108.50 per lineal foot was "cheap, low."

Carlo Santucci, General Manager of plaintiff, testified that on December 14, 1966, the day the bid was submitted, he was returning with Nicholas Santucci, President of plaintiff, from Indiana where they had been for two days and, upon radioing his office, he was informed that plaintiff was the low bidder on the project and that there had been a large discrepancy in bids. When he arrived at the company office, he examined the bid sheets and discovered that the original and intended material cost for the pipe of $142.75 per foot had been scratched out, and the figure of $74.00 had been substituted. He testified he could not buy the pipe for the latter figure and that before he went to Indiana the $142.75 cost figure had been used in their estimate, and he did not become aware of the substitution until his return. He also stated that plaintiff's estimator, Geza Zoltani, who had prepared the bid, had made the change.

Geza Zoltani testified that Nicholas Santucci, on the morning of December 14, 1966, told him to alter the bid so that it totaled approximately $1,095,000. He stated Nicholas Santucci was not out of town on that date and that he (Nicholas Santucci) had signed the bid book in the morning before his (Zoltani's) submission of the bid. He denied telling Carlo Santucci that he received a telephone bid from a supplier of drainpipe, offering a 50% discount. He admitted that he lost his pension rights when he left plaintiff to work for another contractor, and he denied, in the presence of Carlo Santucci and John Durgom, that he said he would testify in favor of plaintiff if his pension rights were reinstated.

John Durgom, president of Durgom Concrete Pipe Company, testified he had submitted an estimate to plaintiff of approximately $145.00 per lineal foot for the drainpipe in question. He was present in the hall outside the courtroom when Geza Zoltani told Carlo Santucci something like, "If you say that I get my pension, I can say what you want me to say in court."

Carlo Santucci was recalled and testified that Zoltani approached him in the courthouse and said, "I am unhappy about losing my profit sharing and if there was something I (Carlo Santucci) could do to get him his profit sharing, that he could see that this case went in our favor."

He also testified that he and Nicholas Santucci on the morning of December 14, 1966, were in Terre Haute, Indiana and that when he returned to the company office, Zoltani told him he had changed the price of the pipe after a phone call from Vulcan Materials, giving a 50% discount on the cost of the pipe. The practice of obtaining quotations by telephone was customary.

It further appears that on December 15, 1966, plaintiff sent a letter to defendant requesting that the bid be withdrawn; that defendant accepted plaintiff's bid on January 3, 1967, and when plaintiff refused to enter into a contract, that defendant retained plaintiff's bid deposit.

The trial court found that (1) plaintiff had made a mistake in the amount of its bid; and (2) defendant should have known that a mistake had been made. It rescinded the bid proposal and ordered that the $75,000 deposit be returned to plaintiff together with interest from December 15, 1966 to April 27, 1970, the date of the first hearing.

*OPINION*

Defendant first contends that plaintiff failed to sustain its burden of showing that a mistake justifying rescission had been made. It argues that if there was an error in the bid, it was the result of poor business judgment or negligence, neither of which would justify rescission.

■■ We initially point out that the trial court's findings will not be disturbed on appeal where there is evidence in the record to support them and they are not against the manifest weight of the evidence. *Kenny Construction Co. v. Metropolitan Sanitary District*, 52 Ill.2d 187, 288 N.E.2d 1.

Here, we note that the bid eventually accepted was for $1,596,554, and there was a great disparity in the specified cost of drainpipe in the various bids and estimates. Plaintiff's bid was (1) over $500,000 less than in its original estimate; (2) over $600,000 less than in defendant's estimate of drainpipe; (3) over $400,000 less than the next lowest bidder; and (4) over $650,000 less than the highest bidder. As a matter of fact, defendant's estimate for the entire project ($1,937,856.40) was $842,000 more than plaintiff's bid ($1,095, 842), which figure was $300,000 less than defendant's estimated cost of the drainpipe alone ($1,408,213.40). This disparity resulted primarily from the change by Zoltani of the cost of drainpipe (base price and material cost) from $181.00 per lineal foot in plaintiff's original estimate to $108.50 in the submitted bid. In addition, Carlo Santucci testified he could not purchase drainpipe for $74.00 per lineal foot, the base price used by Zoltani in reaching the $108.50 cost in the submitted bid, and furthermore, it appears that defendant had estimated a base price of $125.00 per lineal foot for drainpipe.

Furthermore, Zoltani admitted he had no authority to submit bids without the approval of Nicholas Santucci, but it was his testimony that the latter had approved the changes on the morning of December 14, 1966, the date the bid was submitted. Carlo Santucci testified that he and Nick Santucci were out of town on that day and when they returned he was informed by Zoltani that the changes had been made after he received a telephone call from Vulcan Materials quoting a price of $74.00 per lineal foot for the pipe.

It is apparent from its decision that the trial court decided that Carlo Santucci was more credible than Zoltani and, on the question of whether Nicholas Santucci had directed or approved the change, we find no difficulty in accepting the court's conclusion to the contrary, particularly in view of the testimony of Carlo Santucci, corroborated by John Durgom, that Zoltani was willing to testify favorably to plaintiff if his pension rights were restored. Having so decided, the trial court could have determined that Zoltani mistakenly used the base figure of $74.00 in determining the cost of the drainpipe. In any event, we believe the totality of the evidence sufficiently supports the finding that a mistake had been made.

■■ We turn now to the question as to whether the mistake justified rescission, and it is noted that in *People ex rel. Department of Public Works and Buildings v. South East National Bank*, 131 Ill.App.2d 238, 266 N.E.2d 778, where the trial court rescinded a bid and ordered the return of the bid deposit, it was stated at page 241 that the conditions generally required for rescission are (1) that the mistake relate to a material feature of the contract; (2) that it is of such grave consequence that enforcement of the contract would be unconscionable; (3) that it occurred notwithstanding the exercise of reasonable care; and (4) that the other party can be placed *in statu quo.*

■■ Here, in view of the fact that the mistake involved the drainpipe cost, which was three-fourths of the cost of the entire project, it clearly involved a material element of the contract. It appears also that plaintiff stood to lose a substantial sum if it performed at the price quoted in its submitted bid of $1,095,842. This amount was almost $600,000 less than the next lowest bid and $500,000 less than the bid of $1,596,554 subsequently entered into by defendant for construction of the drain. Under those circumstances, we are of the opinion that it would have been unconscionable to enforce the contract.

■■ The trial court, in rescinding the bid, necessarily found that the mistake occurred despite the use of reasonable care on the part of plaintiff. Defendant contends that whether or not Zoltani was authorized to make the bid changes, he was negligent in doing so without further

verification of the Vulcan price quote. Defendant refers us to *Steinmeyer v. Schroeppel*, 226 Ill. 9, 80 N.E. 564, where in adding figures a mistake of $421.00 was made in an $1,867.00 bid. The Illinois Supreme Court found the mistake was the result of negligence and required the fulfillment of the contract. We note however that at pages 14-15 the court stated:

"A mistake which will justify relief in equity must affect the substance of the contract, and not a mere incident or the inducement for entering into it. The mistake of the appellants did not relate to the subject matter of the contract, its location, identity or amount, and there was neither belief in the existence of a fact which did not exist or ignorance of any fact material to the contract which did exist."

In the instant case, as we have stated above, the mistake was one of substance which did relate to the subject matter of the contract; there was belief in a fact which did not exist, the $74.00 per lineal foot base price for drainpipe. Thus, it would appear that *Steinmeyer* supports the finding of due care by the trial court here. Moreover, the question of due care is one of fact to be decided by the trial court whose findings will not be disturbed unless they are manifestly against the weight of the evidence. (*Kenny Construction Co. v. Metropolitan Sanitary District, supra.*) Here, the evidence indicates that it was customary in the construction business to receive and act upon telephone price quotes. There is no testimony of any practice requiring verification or that there was some custom in that trade to prepare and submit bids in any other manner. In view thereof, it is our belief that the mistake was not the result of negligence.

As to whether defendant can be placed *in statu quo*, there was testimony to the effect that federal participation in the project was reduced to reflect the $75,000 forfeiture by plaintiff. However, it should be noted that plaintiff promptly notified defendant on December 15, 1966, of its intention to withdraw. Defendant could have allowed plaintiff to withdraw at that time, and thus no federal funds would have been lost. Furthermore, it appears that the contract was subsequently relet for $1,596,554, which was approximately $100,000 less than the second lowest bid submitted on December 14, 1966. Under the circumstances, it was apparent that defendant was not prejudiced.

Accordingly, we believe that the four conditions for rescission as set forth in *South East National Bank* were met.

■■ We will next consider the propriety of the trial court's finding that defendant should have known of plaintiff's mistake. Defendant argues that plaintiff's bid was not on its face so grossly disproportionate to the

other bids as to give notice that the bid was a mistake. In this regard, we note that in *Bromagin v. City of Bloomington,* 234 Ill. 114, 84 N.E. 700, in holding that the party to whom the bid was made was aware of a mistake at the time the bid was accepted, the court stated at page 120:

> "The bid submitted showed, by one item thereof, that appellees proposed to furnish and lay 6020 feet of sixteen-inch pipe for a sum therein designated. This sum was less than they could purchase this pipe for, leaving out of consideration the expense of laying the same. The city engineer, who was a member of the board of local improvements, observed this fact and acquainted the other members of the board therewith. It seems apparent, therefore, that the board of local improvements accepted the bid knowing that this mistake had been made. * * * Bromagin discovered the error in his bid and notified the city attorney of the same and asked to be relieved from any further obligation on the day and within five hours after the bid was accepted and before any contract had been actually signed. It does not appear but that the city, after Bromagin called on the city attorney, could have accepted some one of the other bids made."

We have previously noted the great disparity in the bids here, including the fact that plaintiff's submitted bid for the entire project was over $300,000 less than defendant's estimate for the cost of the pipe, and we cannot accept defendant's contention that they were not so disproportionate as to give notice that plaintiff's bid was the result of a mistake. Richard Cramer, head of the Estimating Division of defendant's Highway Department, testified that he considered plaintiff's bid to be "cheap, low." Moreover, the record discloses that plaintiff, after discovering the mistake and believing that it could not perform the contract as submitted, sent a letter to defendant on December 15, 1966, the day after its bid was submitted, requesting withdrawal of the bid. Approximately seventeen days later, defendant accepted the bid, even though it was clearly evident that there were large discrepancies between the amounts of the bids and particularly between plaintiff's bid and defendant's own estimate (over $842,000). We think the record amply justifies the trial court's finding that defendant should have been aware of plaintiff's mistake.

Defendant also contends that plaintiff's failure to produce a witness within its control created a presumption that the testimony of that witness, if produced, would be adverse to plaintiff. In support thereof, defendant points out that Zoltani testified that he was directed by Nick Santucci to make changes in the bid, and argues that the trial court

erred in accepting Carlo Santucci's uncorroborated testimony that Zoltani had informed him of the telephone call from Vulcan Material Company, quoting a $74.00 base price for the drainpipe. Defendant maintains that the failure on the part of plaintiff to produce someone from Vulcan to corroborate the telephone call raises the presumption that there was no such call and substantiates Zoltani's testimony that he was directed to change the bid.

It is the general rule that where a potential witness is available and appears to have information relevant to the case which would not be merely cumulative, and where his relationship with one of the parties is such that the witness would ordinarily be expected to favor him, then if such party does not produce his testimony, the inference arises that it would have been unfavorable. (*Biel v. Wolff*, 126 Ill.App.2d 209, 261 N.E.2d 474.) Here, Carlo Santucci testified, when called in rebuttal, that he had a conversation with Zoltani in which the latter stated he had received a telephoned cost quote from Vulcan. As we view the record, it appears to have been accepted by the court as impeachment and that a proper foundation was laid for this impeachment in that Zoltani, in his prior testimony, had denied the conversation. Under the circumstances, to produce a witness from Vulcan merely to testify that a telephone call had been made would be merely cumulative. Furthermore, it does not appear that plaintiff was aware of the name of the individual from Vulcan who allegedly made the telephone call to Zoltani or that Vulcan kept a record of the cost quote. In addition, the record does not disclose any relationship whereby Vulcan might be expected to favor plaintiff. In view thereof, it is our opinion that the court did not err in accepting Carlo Santucci's testimony concerning the conversation with Zoltani. See *Biel v. Wolff, supra.*

Finally, defendant contends that, assuming we find a mistake justifying rescission of plaintiff's bid, it should only be liable for interest from the date of judgment. It argues that the trial court improperly awarded interest, "at the statutory rate, from December 15, 1966 to April 27, 1970."

In their briefs, both parties refer to section 2 of the interest statute (Ill. Rev. Stat. 1973, ch. 74, par. 2) as controlling. In pertinent part it provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing;
> * * * and on money withheld by an unreasonable and vexatious delay of payment."

In *Kespohl v. Northern Trust Co.*, 131 Ill.App.2d 188, 266 N.E.2d 371,

the court held that to apply the theory of unreasonable and vexatious delay, the evidence must show that the debtor had placed obstacles in the way of collection or had induced the creditor to delay taking proceedings to collect, and that to defend a lawsuit is a right which cannot be construed as unreasonable and vexatious delay.

■■  In the instant case, we are of the opinion that there was an honest dispute as to whether defendant was legally obligated to return plaintiff's bid deposit. In addition, it appears from the record that plaintiff did not bring suit in this matter until March of 1968, a year and a half after its bid was accepted. Neither does it appear that defendant was responsible for the delay in bringing this matter to trial, or that defendant used any other tactics which could be considered the unreasonable and vexatious delay of payment.

For the reasons stated, we believe that the trial court's award of interest, pursuant to section 2 of the interest statute, was unwarranted and should be reversed.

Accordingly, the judgment is affirmed as to the rescission of the bid and the award of $75,000.00 to plaintiff but is reversed as to the award of interest from December 15, 1966 to April 27, 1970.[1]

Affirmed in part; reversed in part.

BARRETT and DRUCKER, JJ., concur.

---

[1] Plaintiff is, however, entitled to interest at the rate of six percent per annum from the date of judgment, under the provisions of section 3 of the interest statute of Illinois (Ill. Rev. Stat. 1973, ch. 74, par. 3).