**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (5th) 180541WC-U

Order filed December 5, 2019

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | |
|---|---|
| DU QUOIN HOME LUMBER,<br>　　　　Appellant,<br>　　　　v.<br>ILLINOIS WORKERS' COMPENSATION<br>COMMISSION *et al.* (Paul Fred, Appellee). | ) Appeal from the<br>) Circuit Court of<br>) Perry County<br>) No. 18MR74<br>)<br>) Honorable<br>) Christopher T. Kolker,<br>) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
　　　　Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment.

**ORDER**

¶ 1　　*Held*: (1) By omitting the issue from both its petition for review and statement of exceptions that it filed with the Illinois Workers' Compensation Commission (Commission), respondent has forfeited its statute of limitations defense.

(2) By finding that petitioner sustained a work-related injury on December 23, 2010, and that his current condition of ill-being was causally related to the accident, the Commission did not make findings that were against the manifest weight of the evidence.

(3) By finding that petitioner reached maximum medical improvement on June 22, 2012, instead of April 6, 2015, the Commission made a finding that was against the manifest weight of the evidence.

¶ 2 The circuit court of Perry County confirmed a decision by the Illinois Workers' Compensation Commission (Commission) to award workers' compensation benefits to petitioner, Paul Fred, for a back injury. Respondent, Du Quoin Home Lumber, appeals. Petitioner cross-appeals the Commission's award of 75 2/7 weeks of temporary total disability benefits, contending he is entitled to 220 4/7 weeks of such benefits.

¶ 3 Except for the date of maximum medical improvement the Commission used to determine the period of temporary total disability, we conclude that the Commission's decision is not against the manifest weight of the evidence. Therefore, we affirm in part and reverse in part the circuit court's judgment confirming the Commission's decision, and we remand this case to the Commission with directions to award 220 4/7 weeks, instead of 75 2/7 weeks, of temporary total disability benefits.

¶ 4     I. BACKGROUND

¶ 5     A. The Arbitration Hearing

¶ 6    1. *The Voluntary Dismissal of Four of the Eight Claims*

¶ 7 The arbitration hearing was held on June 13, 2017, and at the beginning of the hearing, petitioner voluntarily dismissed case Nos. 12-WC-33621, 12-WC-33656, 13-WC-10222, and 13-WC-10928. That left four remaining claims to be arbitrated: case Nos. 12-WC-26843, 13-WC-10931, 12-WC-26857, and 13-WC-10760.

¶ 8    2. *The Amendment of Accident Dates*

¶ 9 Also at the beginning of the arbitration hearing, the arbitrator allowed petitioner to amend the accident dates in three of those four remaining claims. In case No. 12-WC-26843,

the accident date was amended to December 3, 2010. In case No. 12-WC-26857, the accident date was amended to February 23, 2007. In case No. 13-WC-10931 (the case under consideration in this appeal), the accident date was amended to December 23, 2010. Respondent objected to the amendments, arguing there was no relation back.

¶ 10        3. *A Preliminary Discussion of the "Request for Hearing"*

¶ 11        Respondent completed the "Request for Hearing" form (see 50 Ill. Adm. Code § 9030.40 (2016)) as follows: "Petitioner claims to be entitled to TTD [temporary total disability)] period(s): 1-13-11 to 4.6-15, representing 220 4/7 weeks. Respondent agrees _____ disputes _X_ and claims _____."

¶ 12        At the beginning of the arbitration hearing, the arbitrator interpreted the "Request for Hearing" as putting into dispute only petitioner's *entitlement* to temporary total disability benefits, not the *period* of such benefits if he were entitled to them:

> "ARBITRATOR LINDSAY: ***
>
> * * *
>
> Petitioner is claiming temporary total disability benefits from January 13, 2011, to April 6, 2015, a period of 220 4/7th weeks. *Respondent does not dispute the dates of temporary total disability but does dispute liability for the benefits*. There is no claim for temporary partial disability or maintenance. There are no credits to be provided to Respondent in the event of an award of temporary total disability. And it is my understanding that there are identical claims of TTD being made in two of these cases, but Petitioner is not seeking a double recovery, correct?
>
> [PETITIONER'S ATTORNEY]: That is correct, [J]udge.

- 3 -

ARBITRATOR LINDSAY: Thank you. The nature and extent of Petitioner's injury is in dispute.

So[,] in summary, the issues in dispute in [case No.] 13[-]WC[-]10931 are accident, notice, causal connection, medical bills, *temporary total disability*, and nature and extent. Is that correct?

[PETITIONER'S ATTORNEY]: Yes, Your Honor.

[RESPONDENT'S ATTORNEY]: Yes, Your Honor." (Emphases added.)

¶ 13    4. *The Medical Records Presented in the Arbitration Hearing*

¶ 14    a. Du Quoin Chiropractic Center

¶ 15    Petitioner's medical records dated from 2002, and the first eight or so years of records came from Du Quoin Chiropractic Center, in Du Quoin, Illinois, where petitioner was treated by a chiropractor, Robert Eaton. Some of his appointments with Eaton were for lower back pain, which, judging from the records, waxed and waned from 2002 to 2010.

¶ 16    It also appears from Eaton's records that, frequently, the pain originated from, or was associated with, heavy lifting—something petitioner routinely did in his work for respondent. On March 28, 2007, for instance, petitioner told Eaton that the soreness in his back began the day before, after he moved some shingles. On July 16, 2007, petitioner reported that his lower back had been hurting after he did some lifting and that the pain was radiating down both legs. On September 23, 2008, he described left lower back pain that began about three weeks earlier, after he moved some lumber at work. The pain dissipated in two or three days, after the application of ice, but the pain returned soon afterward, this time on the right side and radiating down the front of the leg, to the knee.

¶ 17    Eaton treated this right-sided pain with approximately six chiropractic adjustments, bringing petitioner to 90% improvement.

¶ 18    On March 8, 2010, petitioner returned to Eaton with severe pain in his lower back as well as left sacroiliac joint pain, this time without any radiation of the pain. Eaton wrote that petitioner had been "steadily *** getting worse for about [three] weeks" but that there had been "no specific injury to cause it."

¶ 19                    b. Wittenauer Chiropractic

¶ 20    Three or four times, from March 2010 to January 2011, petitioner went to Wittenauer Chiropractic, in Pinckneyville, Illinois. The first time he went there, on March 30, 2010, he described pain in his neck and left sacroiliac and left lower back pain, all of which began on February 28, 2010. When the chiropractor, James A. Wittenauer, asked him what made the pain worse, he answered that " 'it [was] when he ben[t] and lift[ed] too much.' "

¶ 21    On January 13, 2011, petitioner returned to Wittenauer and reported that since December 30, 2010, he had been struggling with a "new problem" of right-sided sacroiliac and sciatic pain, the intensity of which he rated as 10 out of 10.

¶ 22    On January 14, 2011, the right-sided sacroiliac and sciatic pain was at an intensity of 9 out of 10.

¶ 23                    c. Tri-County Chiropractic Centre

¶ 24    On January 26, 2011, petitioner went to Tri-County Chiropractic Centre, in Du Quoin, where he was asked to fill out a "New Patient History." He wrote, on this form, that his chief complaint was right-sided back pain and pain down his right leg. He indicated that the pain stemmed from an on-the-job injury, but he left the date of the accident blank, explaining that he did not want to claim workers' compensation.

¶ 25       The chiropractor, Douglas Cochran, supplemented this patient history with his own notes. According to Cochran's notes, petitioner told him he had been suffering from severe lower back pain and right leg pain for several weeks, after lifting drywall. This was not the first time that lifting had put his back out, but such episodes, petitioner reported, were getting worse. This time, the pain was an 8 or 9 out of 10.

¶ 26       The pain, Cochran noted, was in the region of L3 to S1 and in the right upper anterior thigh. Lumbar X-rays revealed mild degenerative changes throughout the lumbar spine. A physical examination yielded a positive straight-leg raise test on the right, positive Lasegue's and Braggard's tests on the right, and right quadriceps weakness. Cochran diagnosed lumbar discopathy.

¶ 27       After four chiropractic treatments in January and February 2011, Cochran referred petitioner for magnetic resonance imaging (MRI) of his lumbar spine.

¶ 28                                   d. The Lumbar MRI

¶ 29       On February 8, 2011, at Cedar Court Imaging in Carbondale, Illinois, petitioner underwent an MRI of his lumbar spine. The MRI revealed a disc protrusion or mild herniation at L2-L3, in the right paracentral region of the spinal canal, extending toward the right foramen and resulting in moderate to severe spinal stenosis and right foraminal stenosis. There was asymmetric disc bulging at L3-L4, toward the right. At L4-L5, there was moderate to prominent left facet arthropathy indenting and compressing the left lateral and left posterolateral aspects of the thecal sac. At L5-S1, there was asymmetric bulging of the disc centrally and posterolaterally toward the left, extending into the inferior left foramen.

¶ 30       In short, the MRI showed multilevel disc disease with areas of spinal stenosis and foraminal stenosis.

¶ 31                e. The Initial Appointment at Heartland Spine Institute
and the Referral for Epidural Steroid Injections

¶ 32        On February 23, 2011, petitioner went to Heartland Spine Institute in Marion, Illinois, having been referred there by his family doctor, Craig W. Furry, because of pain in the lower back, right hip, and leg. "This started in January 2011," according to a note taken by a physician's assistant.

¶ 33        A neurosurgeon at the Heartland Spine Institute, Franklin Hayward, examined petitioner. Hayward noted a decreased range of motion, paralumbar tenderness, sciatic nerve tenderness on the right, positive straight-leg testing on the right, and decreased sensation in the S1 distribution. After reviewing the lumbar MRI, Hayward diagnosed a disc protrusion, asymmetric toward the left, along with multilevel disc bulging and degeneration and right L5-S1 radiculopathy.

¶ 34        Hayward referred petitioner to Southern Illinois Pain Management, in Marion, for an epidural steroid injection.

¶ 35                f. Southern Illinois Pain Management

¶ 36        On March 2, 2011, petitioner went to Southern Illinois Pain Management, and a physician there, Julie Sowerby, wrote as follows in her report:

> "[Petitioner] has a quite physical job working for a lumber yard. He reports that he has noticed gradually increasing back pain with the work that he does over a number of years. He states that he is a delivery person, and has to lift and move packets of shingles, which are quite heavy. He reports that his back pain began upon awakening from sleep on January 12, 2011. He did not have any new injury or trauma at that time. He does note difficulty performing his job duties due to his low back and leg pain. *** He states that prior to this morning in January when he

- 7 -

awakened with pain, he did not have the leg symptoms that he currently has."

¶ 37                                                  g. The Lumbar CT Scan and X-Ray

¶ 38            After receiving two epidural steroid injections, which gave him, at best, only temporary relief, petitioner returned to Hayward and told him he could take the pain no longer and that he wanted surgery.

¶ 39            Preliminarily to the surgery, Hayward referred petitioner to Memorial Hospital of Carbondale, Illinois, for a lumbar computed tomography (CT) scan and a flexion/extension radiograph of the lumbar spine.

¶ 40            On May 18, 2011, petitioner went to Memorial Hospital and underwent a lumbar myelogram and post myelogram CT scan. It revealed disc herniations at L2-L3 and L3-L4, lateralizing to the right; severe degenerative changes to the facet joints at L4-L5; a mild disc bulge at L4-L5; minimal anterolisthesis; and a disc bulge at L5-S1.

¶ 41            Lumbar X-rays from the same date confirmed that there was spondylolisthesis at L4-L5.

¶ 42                                                  h. The Back Surgery

¶ 43            On June 23, 2011, petitioner underwent back surgery. The surgeon, Hayward, performed transforaminal interbody fusions at L4-L5 and L5-S1, on the right; a laminectomy and discectomy at L3-L4, on the right; and a laminectomy at L2-L3, on the right.

¶ 44            On September 2, 2011, petitioner returned for a follow-up examination. Hayward described him as "ecstatic" and very pleased with the outcome of the surgery.

¶ 45                                                  5. *Vaught's Opinions*

¶ 46            In April 2015, at the request of his attorneys, petitioner underwent an examination by a neurosurgeon, Kevin A. Vaught, at Regional Brain & Spine, in Cape Girardeau, Missouri.

During the examination, petitioner told Vaught he had suffered two work-related accidents, one in December 2010 and the other in January 2011, both involving the carrying of sheet rock. On both occasions, as he was carrying the sheet rock, he was assailed with a stinging and aching sensation in his back, and the pain got worse. He had intermittent back problems before then.

¶ 47 Vaught opined that petitioner's lower back and leg problems were related to those two sheet-rock lifting incidents. The disc herniation at L3-L4 on the right "was a direct result of that work-related injury." In addition to causing the disc herniation, the accidents aggravated preexisting degenerative changes, particularly the foraminal stenosis and the spondylolisthesis. The surgery Hayward had performed was, in Vaught's opinion, reasonable and necessary to repair the work-related injury.

¶ 48 In his deposition of June 28, 2015, Vaught further opined that petitioner had reached maximum medical improvement.

¶ 49 6. *Crane's Opinion*

¶ 50 In September 2015, after Vaught's deposition, another neurosurgeon, Benjamin P. Crane, performed a records review for respondent. Crane was unable to causally relate petitioner's lower back condition to any specific work accident mentioned in the records, and consequently, Crane was unable to say that any specific work accident had necessitated the back surgery.

¶ 51 While explaining his inability, from the records review, to draw a causal line to any specific accident at work, Crane admitted he was at a disadvantage in that he had not taken a history directly from petitioner. Obtaining a history from the patient was, in Crane's view, just about the most important thing he did when he met a patient. Crane admitted that if the history petitioner had given Vaught were accurate—if petitioner had indeed suffered the lifting accidents

noted in Vaught's report—those accidents could have caused petitioner's lower back condition.

¶ 52     When asked whether Cochran's note from January 26, 2011, that petitioner's symptoms began after lifting drywall was reconcilable with a comment Cochran made, in his report, that there was no reference to any injury at work, Crane was equivocal. He admitted there was a distinct possibility that Cochran was referring to a work-related accident in his note of January 26, 2011, but even so, Crane reiterated, the medical records did not specify a date when such an accident occurred.

¶ 53     Etiology aside, Crane made clear he was offering no opinion on the reasonableness and necessity of any of the medical treatment petitioner had received. Crane merely opined that the treatment was not causally related to any work accident that was specifically documented in petitioner's medical records.

¶ 54                    7. *Petitioner's Testimony*

¶ 55     Petitioner was the sole witness to testify in the arbitration hearing.

¶ 56     He testified that for approximately 16 years, until January 12, 2011, he worked for respondent as a delivery handler. In that position, he filled customers' orders for shingles, sheet rock, lumber, windows, doors, concrete, concrete blocks, and any other building materials. He would get an order off the board, pick up the materials, and deliver them to customers. The shingles he handled and delivered came in packages weighing between 75 and 95 pounds per bundle. The sheet rock he handled and delivered weighed approximately 100 to 275 pounds per package, depending on the width of the sheet rock.

¶ 57     His first work-related lifting accident was in February 2007. He was pulling material out of a bin—it was lumber, if he remembered correctly—and he heard something give way in his lower back, and he felt back pain that was at a level of 6 out of 10. He went to his

- 10 -

boss, Bruce Zoller, who told him to take it easy. His back kept getting worse, and he told Zoller he needed to go to a chiropractor. Zoller told him to go ahead and do so. Petitioner received some chiropractic treatment from Eaton, initially paying for it out of his own pocket. He then approached Zoller and objected that since this was a workers' compensation matter, it was not right that he, petitioner, should have to pay for chiropractic treatment out of his own pocket. Zoller responded that because he, Zoller (or, perhaps, by implication, respondent), paid for group health insurance, he wanted to keep it off workers' compensation. Zoller promised he would speak with Eaton and that Eaton would continue providing chiropractic treatment. Petitioner testified that but for this conversation with Zoller, he would have filed a claim for workers' compensation.

¶ 58        After some further chiropractic adjustments, petitioner was able to return to full duty, without restrictions.

¶ 59        Then, sometime between October 2007 and September 2008, petitioner hurt his back again, this time while lifting shingles. He returned to Eaton, and again Zoller agreed to pay for chiropractic treatment by Eaton—the same arrangement as before—and again petitioner refrained from filing a claim for workers' compensation. He did not miss any work, and he eventually returned to full duty, without restrictions.

¶ 60        In March 2010, petitioner returned to Eaton, but he did not think the treatment that time was for any work-related accident.

¶ 61        Petitioner recalled seeing Wittenauer, too, on March 30, 2010, but he thought it was for the shoulder and the upper back instead of the lower back. When asked if he would disagree with the medical (or chiropractic) records if they stated he was suffering from left-sided sciatic pain in March 2010, petitioner answered in the negative. But he testified he continued

- 11 -

working for respondent at full duty, without any restrictions, into December 2010.

¶ 62        The job-ending back problems began, by petitioner's account, in early December 2010. On December 3, 2010, he delivered an order to Alongi's Restaurant, in Du Quoin. It was eleven 12-foot long sheets of drywall and some two-by-fours. (Petitioner reviewed the corresponding work order, petitioner's exhibit No. 10, to which he had lacked access after his employment with respondent ended. Once he reviewed this work order and other work orders provided to his attorney, he was better able to pinpoint the dates of injury. He could remember what happened, but without referring to the work orders, he was fuzzy on the dates.)

¶ 63        At Alongi's Restaurant on December 3, 2010, petitioner recalled, he had hold of one end of a package of sheet rock. Sheet rock would wobble and bow in the middle when you took it off the forklift, and that is what the 275-pound package did on this occasion: It bowed and jerked, almost taking petitioner to the ground. He felt something give way in his lower back, and there was a burning, stinging sensation in his back that he rated as 10 out of 10. Never before had he suffered such intense pain; these symptoms were different from those he experienced nine months earlier, in March 2010. Petitioner notified Zoller, who told him to take it easy and go to the chiropractor. Petitioner continued to work, albeit on modified duty. He did not immediately seek treatment; he wanted to see if he would improve during the Christmas and New Year's holidays.

¶ 64        Petitioner continued working until the Christmas break, and his symptoms did not go away. On December 23, 2010 (as he was reminded by the work order labeled petitioner's exhibit No. 11), he made a delivery of sheet rock to a customer named Carl Goldman. Not only did he deliver sheet rock to Goldman's house that day, but he picked up some returns. While helping to carry out of the house three pieces of sheet rock weighing 75 pounds apiece, petitioner

had to duck low to exit a doorway, and he felt his back pop again in the same place as at Alongi's Restaurant; again the pain was 10 out of 10. He notified Zoller of the accident, and as before, Zoller told him to take it easy and that the holidays were coming up and maybe he would get better over the holidays.

¶ 65    Petitioner's back condition was unimproved after the holidays. On January 10, 2011, he got up to go to work and found he was unable to bend over and put on his socks. He sought treatment at Wittenauer Chiropractic. When asked, in the arbitration hearing, if he had told anyone at Wittenauer Chiropractic about his workplace injury, he answered he thought he had but that he could not swear to having done so.

¶ 66    Eventually, after lumbar injections, petitioner underwent back surgery, which helped. He testified, however, that he still was unable to lift over 50 pounds and that ongoing pain still prevented him from doing any stooping. His days as a delivery handler were over.

¶ 67    On cross-examination, petitioner was inconsistent as to whether he made any deliveries after getting hurt in early December 2010. He testified he sat around at work and could not do much. When asked about a delivery of wooden boxes to Taylor Brothers on December 21, 2010 (as shown by a work order), he explained that he drove the delivery truck to Taylor Brothers but that other employees unloaded the boxes.

¶ 68    Petitioner also testified, on cross-examination, that his last day of work for respondent was January 10, 2011. But then he was shown a delivery ticket for January 11, 2011, and he agreed that his initials were on the ticket—he had no explanation.

¶ 69    It was petitioner's recollection that he never saw a doctor in March 2010. When shown Eaton's records from March 2010, he testified there was another "Steve [*sic*] Fred" in Du Quoin whom Eaton must have treated.

¶ 70　　　　Petitioner agreed there was no incident or accident in January 2011. It was his testimony that by January 10, 2011, his pain was so bad he no longer could stand it and he could not even drive. He related that pain to the two incidents in December 2010. He knew for certain he was injured at Alongi's Restaurant on December 3, 2010, and at Carl Goldman's house on December 23, 2010. He denied simply picking those two dates at random. It was just that he could not remember the exact date of the injury until he was shown the work tickets.

¶ 71　　　　Petitioner also denied that his lower back pain developed in 2007 and continued until he quit working in January 2011. He insisted, rather, that his lower back pain resolved in 2008 and that he was reinjured in December 2010.

¶ 72　　　　It was "fair to say," petitioner admitted, that he knew all along, before reviewing the work tickets, *where* he had been injured: at Alongi's Restaurant and at Goldman's house; he just had been unable to pinpoint the *dates*. The work order tickets helped him to identify the dates of his injuries as December 3 and 23, 2010.

¶ 73　　　　When asked why he had filed so many workers' compensation claims if he knew, all along, that he had been injured at Alongi's Restaurant and at Goldman's, petitioner answered he did not know but that perhaps it was on the advice of his attorneys that he had done so. In any event, once he was provided the work order tickets, he knew exactly when he had been injured. He always had known where, and the work order tickets confirmed when.

¶ 74　　　　　　　　　　　　B. The Arbitrator's Decision

¶ 75　　　　For 12 reasons, the arbitrator found petitioner to be a less than credible witness and his testimony to be "largely self-serving."

¶ 76　　　　First, in the arbitrator's view, the medical records cast doubt on petitioner's testimony that Zoller's alleged opposition to the filing of workers' compensation claims had

- 14 -

made petitioner not "want to mention a work accident to any doctors." Petitioner must have been willing enough to do so, the arbitrator concluded, because his medical records from as far back as 2002 contained references to work-related accidents.

¶ 77        Second, petitioner testified that in September 2008 he had no complaints in the right side of his back or in his leg, whereas records from Eaton's office showed otherwise.

¶ 78        Third, after admitting, on direct examination, that he received treatment in March 2010, petitioner denied, on cross-examination, that he received any treatment that month—and he even went so far as to suggest that there was another "Steve Fred" in Du Quoin who must have received the treatment.

¶ 79        Fourth, in his testimony, petitioner denied suffering gradually increasing back pain from his job duties, and he voluntarily dismissed his claims based on repetitive trauma. In March 2011, however, he told Sowerby " 'he ha[d] noticed gradually increasing back pain with the work he [did] over a number of years.' "

¶ 80        Fifth, petitioner testified that after hurting his back at Alongi's Restaurant on December 3, 2010, he was unable to do any more lifting and carrying of construction materials and that his symptoms did not abate as he performed "modified duty," such as driving the delivery truck. The arbitrator had a hard time squaring that testimony with petitioner's further testimony that he injured his back on December 23, 2010, as he was carrying sheet rock out of Goldman's house.

¶ 81        Sixth, petitioner "could not even get his story straight when being seen by his own examining physicians." When seen by Hayward on February 23, 2011, he gave Hayward an onset date of "January 2011," with no further details. When seen by Sowerby on March 2, 2011, he gave Sowerby an onset date of January 12, 2011, saying that he felt back pain upon

- 15 -

awakening.

¶ 82     Seventh, it was petitioner's testimony that Cochran had referred him to Hayward. Not only did Cochran's records fail to corroborate that testimony, but according to Hayward's records, it was Furry, not Cochran, who had made the referral to Hayward. Given that Furry was the referring doctor, the arbitrator was unable to understand why Furry's records were never produced in the arbitration hearing.

¶ 83     Eighth, petitioner went into the arbitration hearing knowing that not only the dates of injury but also "the mechanisms of the injury" were in dispute. Nevertheless, even though he testified that two other workers had helped him deliver sheet rock to Alongi's Restaurant on December 3, 2010, when he allegedly injured his back, he never subpoenaed or called either of those witnesses, nor did he give any explanation for this omission.

¶ 84     Ninth, although petitioner was unsure he had told Wittenauer about his accident of December 3, 2010, he testified he had told Cochran and also Hayward's assistant, Chris Hodges, "about hurting his back at work." And yet, the arbitrator asserted, "[n]one of the records of these treaters corroborates Petitioner's testimony." (Earlier in her decision, however, the arbitrator made the following finding of fact: "Dr. Cochran noted [on January 26, 2011,] that Petitioner had been experiencing severe lower back pain and right lower extremity pain and had been unable to work for the past two weeks due to his pain. Petitioner stated he first noticed his pain after lifting drywall and that this had happened before but was getting worse." It is unclear why, in the arbitrator's view, the phrase "first noticed his pain after lifting drywall" was not a reference to "hurting his back at work.")

¶ 85     Tenth, according to Vaught's report, petitioner told him that physical restrictions recommended by Hayward prevented him from returning to work. And yet, in Hayward's

records, there was no mention of any permanent restrictions—and, apparently, petitioner neglected to tell Vaught that he "never returned to Dr. Hayward for a final release."

¶ 86　　　　Eleventh, according to petitioner's testimony, Vaught recommended that he use ice every 20 minutes. That testimony was uncorroborated by Vaught's report and deposition.

¶ 87　　　　Twelfth, petitioner had "voiced complaints and limitations at trial [that] essentially mirrored those imposed by [his] examining physician, Dr. Vaught," but Vaught had "provided no reason as to why the permanent restrictions were necessary." The arbitrator was under the impression that Vaught thought the restrictions had come from Hayward and that Vaught was simply deferring to Hayward. But Hayward, "when last seeing Petitioner after his surgery," had written that petitioner was doing " 'extremely well' " and that he had "tolerable pain complaints at most." And when Vaught did his examination, he found petitioner's condition to be "normal[,] with only subjective complaints being noted." As far as the arbitrator could see, "[t]here was no corroboration by any credible objective evidence for Petitioner's testimony regarding any current limitations and difficulties."

¶ 88　　　　Because of those perceived difficulties in petitioner's evidence, the arbitrator found as follows: "Petitioner failed to prove he sustained an accident on December 23, 2010[,] that arose out of and in the course of his employment with Respondent. This conclusion is based upon Petitioner's lack of credibility and the lack of corroboration of an accident having occurred as alleged."

¶ 89　　　　　　　　　　C. The Commission's Decision

¶ 90　　　　On June 8, 2018, the Commission affirmed and adopted the arbitrator's denial of the claims in case Nos. 12-WC-26843, 12-WC-26857, and 13-WC-10760, for which separate decisions had been issued.

¶ 91　　　　　In case No. 13-WC-10931, however, a majority of the Commission reversed the arbitrator's decision. The Commission found, contrary to the arbitrator's decision, that petitioner sustained a work-related injury on December 23, 2010.

¶ 92　　　　　The Commission disagreed with the arbitrator that petitioner was not credible. "The delivery slips reveal[ed] that Petitioner made a delivery on December 23, 2010[,] and his testimony relative to the accident was supported by the medical records." In the Commission's view, respondent had "had offered no credible evidence to impeach Petitioner's credibility."

¶ 93　　　　　While finding petitioner to be a believable witness, the Commission acknowledged that "there [were] discrepancies in the medical records, as to the date of accident." The Commission found, however, that "those discrepancies [were] not determinative of Petitioner's claim." After all, he "testified that he injured himself while making a delivery on December 23, 2010," and "[t]he delivery slips reveal[ed] that [he] did, in fact, make a delivery on December 23, 2010." He further testified that upon injuring his back when making the documented delivery on December 23, 2010, "he then notified Mr. Zoller of the accident and was instructed to take it easy while on his vacation." The Commission observed that respondent had "chose[n] not to call Mr. Zoller to rebut Petitioner's testimony." Petitioner "attempted to work through his pain upon his return from vacation and only sought treatment once his pain became unbearable." The record of January 26, 2011, from Tri-County Chiropractic Centre "reveal[ed] that Petitioner first had pain while lifting drywall while working." Therefore, the Commission found it to be proven, by "credible evidence," that on December 23, 2010, petitioner "sustained an accident arising out of and in the course of his employment" and that "there [was] no credible evidence disputing the causal connection."

¶ 94　　　　Even respondent's own expert, Crane, admitted "that the lifting incident as described could cause back and leg pain, and aggravate Petitioner's condition," and Crane further admitted "that the need for surgery would be related to the accident, if Petitioner did sustain an accident." It was just that, in Crane's view, "there was no accident mentioned in the records." That belief was erroneous, the Commission noted, because "the medical records, as early as January 2011, reference[d] a work injury." Thus, petitioner "sustained a work-related accident," and his "condition [was] causally related to the accident."

¶ 95　　　　The Commission found, however, that petitioner reached maximum medical improvement as of June 22, 2012. It was on that date that he last sought medical care from Hayward, and an X-ray at that time "revealed good placement of the hardware following the surgery." His complaints had become tolerable, or so he reported to Hayward in so many words, and he was to follow up in a year. He never did follow up or seek further medical treatment (although, according to petitioner's testimony, that was because he no longer had medical insurance); rather, he retired and henceforth did not look for work. Therefore, the Commission decided to award petitioner temporary total disability benefits from January 13, 2011, which was the last day he worked, through June 22, 2012, the day he last sought medical treatment.

¶ 96　　　　In sum, the Commission ordered respondent to make the following payments to petitioner: (1) $277.20 per week for a period of 75 2/7 weeks (January 13, 2011, through June 22, 2012), representing the period of temporary total incapacity for work under section 8(b) (820 ILCS 305/8(b) (West 2018)); (2) $249.48 per week for a period of 125 weeks, as provided in section 8(d)(2) of the Act (*id.* § 8(d)(2)), for 25% loss of use of the man as a whole, considering that petitioner "underwent an L4-L5 and L5-S1 fusion, an L3-L4 discectomy, and an L2-L3 laminectomy resulting in permanent restrictions"; (3) all reasonable and necessary medical

expenses under section 8(a) (*id.* § 8(a)) and subject to the medical fee schedule; and (4) interest under section 19(n) (*id.* § 19(n)), if any.

¶ 97 Commissioner Lamborn dissented from the reversal of the arbitrator's decision in case No. 13-WC-10931 (the Goldman accident). He considered the arbitrator's decision to be "well[-]reasoned, persuasive[,] *** and grounded in the record," and he would have affirmed the arbitrator's decision in its entirety.

¶ 98 D. The Circuit Court's Decision

¶ 99 The parties sought judicial review in the circuit court of Perry County.

¶ 100 On October 17, 2018, the circuit court confirmed the Commission's decision, finding it was "not against the manifest weight of the evidence" and "not erroneous as a matter of law."

¶ 101 II. ANALYSIS

¶ 102 A. Respondent's Appeal

¶ 103 1. *Relation Back*

¶ 104 In case No. 13-WC-10931 (which is the case under discussion in this appeal), the application for adjustment of claim originally alleged an accident date of January 4, 2011, and the arbitrator allowed petitioner, over respondent's objection, to amend the application by substituting December 23, 2010, as the date of the accident. Respondent's objection to this change was that (1) the amended application would fail to relate back to the original application and (2) since it now was June 13, 2017, the claim in the amended application would be barred by the three-year statute of limitations (820 ILCS 305/6(d) (West 2010)). See *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 160 (2000) (using a relation-back analysis in a workers' compensation case in which the arbitrator had allowed a

claimant to amend her application). The arbitrator's overruling of this relation-back objection was, respondent argues, a reversible error.

¶ 105      Petitioner replies initially by pointing out that respondent, in its petition for review and statement of exceptions, never challenged the arbitrator's relation-back ruling or raised the statute of limitations; consequently, petitioner argues, respondent has procedurally forfeited this affirmative defense. See *Pantle v. Industrial Comm'n*, 61 Ill. 2d 365, 367 (1975) ("The defenses of waiver and estoppel may properly be raised and proved to nullify the effect of [the statute of limitations in the Worker's Compensation Act]," and filing a claim within the statutory period of limitations is "not a jurisdictional requirement."); *McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 584 (2009) ("[A] statute of limitations is an affirmative defense, which may be forfeited if not timely raised by the defendant.").

¶ 106      Respondent counters that the omission of this issue in its petition for review and statement of exceptions makes no difference because "the Illinois Workers' Compensation Act expressly requires the Commission to review all questions of law or fact which appear from the statement of facts or transcript of evidence." Specifically, respondent quotes from section 19(e) of the Act: "If a petition for review and agreed statement of facts or transcript of evidence is filed, *** the Commission shall promptly review the decision of the Arbitrator and all questions of law or fact which appear from the statement of facts or transcript of evidence." 820 ILCS 305/19(e) (West 2018). Respondent also quotes from section 19(b): "The jurisdiction of the Commission to review the decision of the arbitrator shall not be limited to the exceptions stated in the Petition for Review." 820 ILCS 305/19(b) (West 2018).

¶ 107      Just because the Commission has *jurisdiction* to raise questions that are unraised in the petition for review, it does not necessarily follow that the Commission has a *duty* to do so.

- 21 -

To our knowledge, no published decision has ever interpreted section 19(b) and (e) as requiring the Commission, on its own initiative, to raise an issue that a party refrains from raising in *either* its petition for review or its statement of exceptions. *Cf. Klein Construction/Illinois Insurance Guaranty Fund v. Illinois Workers' Compensation Comm'n*, 384 Ill. App. 3d 233, 238 (2008) (in his petition for review, the claimant had raised all the issues upon which the Commission ruled, and the Commission was correct to rule upon those issues even though the claimant had filed no statement of exceptions); *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1026 (2005) (the claimant raised an issue in his statement of exceptions but not in his petition for review; the Commission erred by holding that the claimant had waived the issue). It goes against sound appellate procedure to hold back issues from the Commission and afterward spring them on appeal. For that reason, in *Jetson Midwest Maintenance v. Industrial Comm'n*, 296 Ill. App. 3d 314, 315-16 (1998), we agreed with the Commission that the claimant in that case had waived (or procedurally forfeited) an issue "by failing to raise it in the petition for review *or* in a timely statement of exceptions." (Emphasis added.) The supreme court has held that "[a]rguments not raised before the Commission are waived on appeal." *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 414 (2005). If, after raising an issue with the arbitrator, a party leaves the issue out of *both* its petition for review and its statement of exceptions, a party thereby signifies to the Commission that the party has abandoned that issue. Requiring the Commission, in such circumstances, to address the issue anyway would go against *R.D. Masonry* and would press the Commission into service as an advocate for the parties.

¶ 108       Admittedly, section 19(e) requires the Commission to "review *** all questions of law or fact which appear from the statement of facts or transcript of evidence" (820 ILCS 305/19(e) (West 2018)), but the sentence imposing that requirement begins with a condition,

- 22 -

namely, the filing of a petition for review: "If a petition for review and agreed statement of facts or transcript of evidence is filed, *** the Commission shall promptly review the decision of the Arbitrator and all questions of law or fact which appear from the statement of facts or transcript of evidence." *Id.* "The Petition for Review shall contain a statement of the petitioning party's specific exceptions to the decision of the arbitrator." *Id.* § 19(b). An "exception" is another word for an "objection," and "a specific objection waives all other unspecified grounds." *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005). By omitting the relation-back objection from both its petition for review and its statement of exceptions, respondent signified it was waiving that objection (see *id.*)—and, again, "[a]rguments not raised before the Commission are waived on appeal" (*R.D. Masonry*, 215 Ill. 2d at 414).

¶ 109                              2. *The Sufficiency of the Evidence*

¶ 110          The arbitrator makes some valid points about inconsistencies in petitioner's testimony and contradictions between his testimony and the medical records. Even so, as the appellate court has held:

> "It is the province of the Commission to weigh and resolve conflicts in testimony, including medical testimony, and to choose among conflicting inferences therefrom. [Citations.] It is only when the decision of the Commission is without substantial foundation in the evidence or its finding is manifestly against the weight of the evidence that the findings of the Commission should be set aside." *Dexheimer v. Industrial Comm'n*, 202 Ill. App. 3d 437, 442-43 (1990).

The arbitrator identified some real problems in petitioner's case, but they are not, as a matter of law, fatal problems. The evidence is not all on one side. Some substantial points in petitioner's favor can be made.

¶ 111     First, until December 2010, petitioner was doing his job, which entailed a lot of heavy lifting, *e.g.*, packages of shingles weighing between 75 and 95 pounds and packages of sheet rock weighing 100 to 275 pounds. Surely, it took a strong back to do that job. Granted, petitioner had intermittent back pain from 2008 to December 2010, but, arguably, if he had the full extent of back problems before December 2010 that the MRI showed him to have in February 2011, it seems implausible that he would have been able to perform such back-breaking labor.

¶ 112     Second, petitioner had an objectively observable injury of the spine, as shown in the MRI and the CT scan, and experts on both sides, Vaught and Crane, agreed the injury could have been caused by heavy lifting.

¶ 113     Third, on January 26, 2011, petitioner told Cochran he had been suffering from severe lower back pain and right leg pain for several weeks, after lifting drywall, and that he had been unable to work for the past two weeks because of his pain.

¶ 114     Fourth, petitioner testified he told Zoller, on December 23, 2010, that he had injured his back carrying sheet rock out of Goldman's house and that Zoller told him to take it easy and see if his back got better over the holidays.

¶ 115     Fifth, respondent never called Zoller to dispute petitioner's testimony. Although the arbitrator criticized petitioner for failing to call corroborating witnesses, these missing witnesses were under respondent's control, and respondent called none of them to rebut petitioner's testimony. Under the missing witness rule, if a party fails to produce a witness the party could have produced and if the following propositions hold true, it may be inferred that the witness's testimony would have been unfavorable to that party: (a) the witness was under the party's control and could have been produced by the exercise of reasonable diligence, (b) the

witness was not equally available to the adverse party, (c) a reasonably prudent person under the same or similar circumstances would have produced the witness if the person believed the testimony would be favorable, and (d) no reasonable excuse for the failure has been shown. *Shvartsman ex rel. Shvartsman v. Septran, Inc.*, 304 Ill. App. 3d 900, 903 (1999). Zoller and other employees of respondent were more available to respondent than to petitioner. These employees would have been naturally aligned with their employer; one would expect that, in their testimony, they would have been as favorable to respondent as truthfulness would have allowed. See *Santucci Construction Co. v. County of Cook*, 21 Ill. App. 3d 527, 534 (1974) ("his relationship with one of the parties is such that the witness would ordinarily be expected to favor him").

¶ 116        Why allow petitioner's testimony to go unrebutted if two or three other employees were firsthand witnesses to what happened on December 23, 2010? If, on that date, when carrying sheet rock out of Goldman's house, petitioner suddenly was stricken with back pain that he described as the absolute maximum, 10 out of 10, surely the coworker on the other end of the sheet rock would have noticed some outward manifestation of such extreme pain. And surely, if in fact the coworker noticed nothing out of the ordinary, respondent would have deemed it worthwhile to call this coworker and have him so testify. But respondent did not call this coworker, and the omission was unexplained. See *Shvartsman*, 304 Ill. App. 3d at 903; *Santucci*, 21 Ill. App. 3d at 534.

¶ 117        Likewise, if, contrary to petitioner's testimony, petitioner did *not* tell Zoller on December 23, 2010, that he injured his back or if Zoller had no memory of petitioner's doing so, respondent surely would have deemed it worthwhile to call Zoller and have him so testify. And if in fact Zoller did *not* discourage petitioner from claiming workers' compensation, respondent

surely would have, at a minimum, a reputational interest in calling Zoller and having him so testify. But respondent did not call Zoller, and, again, the omission was unexplained. See *Shvartsman*, 304 Ill. App. 3d at 903; *Santucci*, 21 Ill. App. 3d at 534.

¶ 118　　　There is a risk in allowing unfavorable testimony to go unrebutted: The trier of fact might choose to believe the unrebutted testimony. Not *every* reasonable trier of fact would have to disbelieve petitioner. By crediting petitioner's testimony and finding he sustained a work-related injury on December 23, 2010, the Commission did not make a finding that was against the manifest weight of the evidence. See *Rechenberg v. Illinois Workers' Compensation Comm'n*, 2018 IL App (2d) 170263WC, ¶ 39.

¶ 119　　　There is also evidence in the record to justify the finding that petitioner's current condition of ill-being is causally related to the accident of December 23, 1010. To quote from the arbitrator's findings of fact, "Dr. Vaught confirmed on further cross-examination that his causation opinions were related to alleged accidents in either December of 2010 or January of 2011." And to quote again from the arbitrator's findings of fact, "Dr. Crane testified that, to a reasonable degree of medical certainty, if Petitioner suffered the two work accidents described to Dr. Vaught in December of 2010, those accidents might or could have caused or aggravated Petitioner's low back condition." "It is well[-]established that a finding of a causal relationship may be based upon a medical expert's opinion that an accident 'could have' or 'might have' caused an injury." *Price v. Industrial Comm'n*, 278 Ill. App. 3d 848, 853 (1996).

¶ 120　　　　　　　　　B. Petitioner's Cross-Appeal

¶ 121　　　The parties, by petitioner's understanding, stipulated, at the beginning of the arbitration hearing, that the period of temporary total disability benefits would be 220 4/7 weeks if petitioner were found to be eligible for such benefits at all, and therefore, he argues, the

Commission erred by awarding him only 75 2/7 weeks of such benefits. Respondent denies entering into any such stipulation.

¶ 122    "A stipulation is an agreement between parties or their attorneys with respect to an issue before the [tribunal]." (Internal quotation marks omitted.) *Wisam 1, Inc. v. Illinois Liquor Control Comm'n*, 2014 IL 116173, ¶ 42. Although a stipulation need not be in any particular form, the stipulation must be "clear, certain, and definite in its material provisions," and it must "be assented to by the parties or those representing them." *In re Marriage of Galen*, 157 Ill. App. 3d 341, 344 (1987). The proposition to which respondent's attorney assented, judging by the transcript of the arbitration hearing, was that "temporary total disability" was one of "the issues in dispute," not that "the dates of temporary total disability" were undisputed.

¶ 123    Granted, the arbitrator stated, "Respondent does not dispute the dates of temporary total disability," and respondent did not gainsay that statement. Instead of considering, however, the doctrine of estoppel by silence (see *Windcrest Development Co. v. Giakoumis*, 359 Ill. App. 3d 597, 605 (2005)), which petitioner really does not argue (he argues, instead, a stipulation), we choose to review on the merits the Commission's finding that petitioner reached maximum medical improvement on June 22, 2012.

¶ 124    Maximum medical improvement marks the end of the period of temporary total disability benefits. See 820 ILCS 305/8(b) (West 2016); *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 142 (2010). In choosing June 22, 2012, as the cutoff date, the Commission relied on two facts.

¶ 125    First, petitioner never returned to Hayward after the visit of June 22, 2012. In his testimony, however, petitioner explained why: he lacked medical insurance and could not afford another visit. This explanation was unrebutted and was not inherently incredible. After all,

petitioner used to have medical insurance through respondent, and his employment with respondent had been terminated. It appears from the record, then, that it was a lack of funds instead of a stabilizing of his medical condition that caused petitioner to stop seeing Hayward. See *Interstate*, 236 Ill. 2d at 142.

¶ 126　　　　Second, after June 22, 2012, petitioner did not look for employment. But "an argument focusing on whether the claimant is available for work in some other capacity and could and should have sought alternative employment misses the mark in [temporary total disability] cases. The dispositive question is whether the claimant's condition had stabilized" (internal quotation marks omitted) (*Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 177-78 (2000)) or, in other words, whether "he is as far recovered or restored as the permanent character of his injury will permit" (*Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118 (1990)).

¶ 127　　　　The only evidence on that question came from Vaught. On April 6, 2015, he examined petitioner, took a history from him, and reviewed his medical records. After doing so, Vaught placed permanent physical restrictions on petitioner, including a 50-pound limit on lifting, and Vaught wrote in his report, and subsequently reiterated in his deposition, that the date of maximum medical improvement was, in his opinion, April 6, 2015. Vaught's opinion in that respect was unopposed by any other expert. Respondent's expert, Crane, having never examined petitioner, was unable to opine on maximum medical improvement. Hayward never suggested that June 22, 2012, was the date of maximum medical improvement. Rather, he believed it would be at least one more year before petitioner could be released from care and that, besides, before even considering releasing petitioner, Hayward would want him to undergo another CT scan and a flexion/extension X-rays of his lumbar spine.

¶ 128    Because the records from Hayward's office militate against a finding that petitioner had reached maximum medical improvement on June 22, 2012, the Commission's finding to that effect is against the manifest weight of the evidence. See *Interstate*, 236 Ill. 2d at 142. The clear preponderance of the evidence is that April 6, 2015, instead, is the date of maximum medical improvement.

¶ 129                              III. CONCLUSION

¶ 130    For the foregoing reasons, we affirm in part and reverse in part the circuit court's judgment and remand this case with directions. We reverse the judgment insomuch as it confirms the Commission's award of 75 2/7 weeks of temporary total disability benefits, and we remand the case to the Commission with directions to award, instead, 220 4/7 weeks of temporary total disability benefits. Otherwise, the judgment is affirmed.

¶ 131    Affirmed in part and reversed in part; cause remanded with directions.